IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 98-50888

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant-Cross-Appellee,

versus

JOHN STEPHEN GROSENHEIDER,

Defendant-Appellee-Cross-Appellant.

---

Appeals from the United States District Court
for the Western District of Texas, Austin Division

---

January 11, 2000

Before GARWOOD, SMITH and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-cross-appellant John Stephen Grosenheider (Grosenheider) was indicted for the receipt and possession of computer images of child pornography under 18 U.S.C. § 2252A(a)(5)(B). After the district court denied his motion to suppress the evidence taken from his computer, Grosenheider entered a conditional guilty plea to one count of possession. The court sentenced him to twelve months' incarceration. Grosenheider appeals the denial of his suppression motion, and the government appeals the sentence. We affirm the district court's denial of the suppression motion, but vacate the sentence and remand for resentencing.

## Facts and Proceedings Below

On October 24, 1997, Grosenheider dropped off his personal computer for repair work at Upgraders, a computer repair shop in Austin, Texas. While conducting a final quality assurance check of the computer on Thursday, October 30, 1997, Upgraders employee Patrick Rowan (Rowan) discovered an unusually large number of image files, known as "JPG's", on the computer's hard drive. Knowing that JPG's in large numbers often depict pornographic images, Rowan opened some of these files and found between two and five images of child pornography. Rowan showed the images to his employer, Nathaniel Monks (Monks), the owner of Upgraders, as well as to two other employees, all of whom agreed that the images depicted child pornography. The repairs now complete, the Upgraders staff returned the computer to the retail store for pick up. Grosenheider retrieved the computer some time later that day.[1]

At approximately 9:00 a.m. the next morning, Friday, October 31, 1997, Monks contacted the Austin Police Department about the images Rowan had discovered. He spoke with Steven Meaux (Meaux), a vice officer, and informed Meaux about the images he had seen and the fact that the computer was now back in Grosenheider's possession. Meaux arrived at Upgraders thirty to forty-five minutes later. His primary purpose was to identify and interview

---

[1] Upgraders occupies two suites at either end of a strip shopping mall in south Austin. The front suite contains the retail store, where customers interact with store personnel and pick up their repaired computers. The back suite is the "tech shop" where the actual repairs take place. Rowan, Monks, and the others all viewed the images on Grosenheider's computer in the tech shop suite. Grosenheider picked up his computer from the retail store suite.

the staff members who had seen the images. Meaux first entered the retail store, but an employee directed him to the tech shop, where Monks, Rowan, and the other employees who had seen the images were waiting. When Meaux got there, Monks told him that Grosenheider had brought the computer back that morning because the hard drive was still not operating properly, and that Rowan had begun working on it in the tech shop. As Meaux began to interview the assembled employees, another employee entered the tech shop and said that Grosenheider had again returned to the retail store, asking about his computer. Meaux told Monks to "stall" Grosenheider by telling him the store needed to order additional parts. Monks complied, and from the tech shop Meaux watched Grosenheider leave the retail store and drive away.

After Grosenheider left, Meaux completed his interview of Rowan, Monks, and the other employees about the images they had seen on the computer. They told him that the images depicted young girls approximately ten years old engaged in sexual conduct of various kinds. During this time, Rowan had been working on his repair of Grosenheider's computer, a process which took approximately fifteen minutes to complete. There is some dispute –which the district court expressly declined to resolve–whether Meaux then asked to see or Rowan offered to show him the pictures. In any event, Rowan attempted to access the images on the computer, only to find them "locked", that is, inaccessible without a password. The password lock had not appeared the day before. Unable to override the lock, Rowan asked another, more experienced

3

Upgraders employee, Cary Richardson (Richardson), for help. By using another image viewing program, Richardson by-passed the lock. Rowan then showed Meaux the images he had seen the day before, as well as additional ones. After viewing between six and ten images, Meaux "had seen enough" to determine that the computer contained depictions of child pornography.

At approximately 11:00 a.m., Meaux took the computer from Upgraders to his office at the Austin Police Department, and contacted Theodore Siggins (Siggins), a special agent with the United States Customs Service. Meaux advised Siggins of his discovery and asked if Siggins was interested in pursuing a federal investigation. Siggins agreed to take over the case, and immediately began preparing a search warrant affidavit. In his affidavit, Siggins recounted the discovery by the Upgraders staff of the pornographic images, Grosenheider's bringing the computer back to Upgraders, and the call from Monks to Meaux. He did not mention Meaux's viewing of the images or his seizure of the computer. At approximately 4:30 p.m. that afternoon, Siggins applied for and received a warrant to search the computer from a United States Magistrate Judge.

*After* obtaining the warrant, Siggins secured the computer from Meaux and took it to Upgraders, where he informed Monks that he had a warrant for the computer and would return it to Upgraders once he had finished searching it. Siggins then took the computer back to his office and made a backup image of the computer's entire hard drive. He analyzed the image on one of the government's

4

computers, and found that Grosenheider had subscribed to *Forte Agent*, an on-line service that enables subscribers to access various "newsgroups" on the Internet.[2] Grosenheider had subscribed to fifteen newsgroups, thirteen of which featured images and messages concerning child pornography.[3] Siggins found that from these newsgroups Grosenheider had downloaded over 500 images of young females, ages ten to fourteen, engaged in various sexually explicit acts. Grosenheider had also established over 250 files, each of which contained at least one image of child pornography and sometimes included textual commentary with the image. Siggins determined further that Grosenheider had viewed many of these images more than once because the "creation date" on the files sometimes differed from the "last access date", meaning that the file had been modified or viewed after being downloaded. Based on these findings, Siggins applied for and received another warrant to search Grosenheider's home in Austin.

On the following Monday, November 3, 1997, Siggins returned the computer to Upgraders in anticipation of a "controlled delivery." Grosenheider's wife picked up the computer from Upgraders that same day and took it back to their home. Federal agents followed Mrs. Grosenheider to the residence; upon her arrival, they executed the search warrant. The agents seized the

---

[2] A "newsgroup" is an Internet site organized around a single topic. Like a bulletin board, a newsgroup enables individuals to post files, such as text messages or images, which other viewers may then read or download onto their own computers.

[3] Eleven of the newsgroups had titles that clearly indicated that they dealt with child pornography.

computer, but did not find any additional child pornography at the residence.

Grosenheider was indicted and charged with (1) Receipt of Visual Depictions of Minors engaged in Sexually Explicit Conduct in violation of 18 U.S.C. § 2252(a)(2), and (2) Possession of Visual Depictions of Sexual Activities by Minors in violation of 18 U.S.C. § 2252A(a)(5)(B). On February 26, 1998, Grosenheider filed a motion to suppress the evidence seized from his computer and residence. While conceding that the first search of his computer by Rowan was a private search, and therefore not subject to the Fourth Amendment, Grosenheider challenged the second search by Meaux. Specifically, he alleged that Meaux's breaking (with the help of Upgraders employees) the password lock, viewing more images than Rowan had seen, and subsequently seizing the computer violated Grosenheider's rights under the Fourth Amendment. The district court conducted two evidentiary hearings, on March 13 and May 1, 1998, and denied the motion in a May 11, 1998 memorandum order. The following day, May 12, Grosenheider entered a conditional guilty plea to the possession charge (Count II), pursuant to which he reserved the right to appeal the denial of his suppression motion. The remaining count was dismissed.

The district court conducted a sentencing hearing on July 31, 1998, and found that Grosenheider's total offense level was eighteen, with an applicable incarceration range of twenty-seven to

6

thirty-three months.[4]  Apparently reasoning that Grosenheider's case bore little resemblance to the "pornography" cases the court had previously sentenced, which (with one exception) had all involved "perverted people with a long track record of harm to others," the district court departed downward and sentenced Grosenheider to twelve months incarceration, followed by a three-year term of supervised release.[5]  In the court's opinion, this sentence was amply sufficient,[6] though the court plainly doubted its legality.[7]

---

[4]  Under U.S.S.G. § 2G2.4, Grosenheider's initial total offense level was twenty-one: fifteen for violating 18 U.S.C. § 2252A(a)(5)(B); two for the specific offense characteristic of material involving a prepubescent minor; two for the characteristic of possessing ten or more images depicting the sexual exploitation of a minor; and two for the characteristic of obtaining the material by using a computer.  Because it found that Grosenheider accepted responsibility for his actions, however, the district court reduced his offense level by three, pursuant to section 3E1.1.  Grosenheider had no prior convictions.

[5]  Before pronouncing sentence on Grosenheider, the district court made preliminary remarks, including the following: "So that everybody knows where we stand, I am concerned with the guidelines in this case. I think they're wrong.  I'm not–not that I have one second of doubt that what you did was not only illegal but just terrible.  But the guidelines in this particular case, it seems to me, are just too high.  I don't see that it does anybody any good to put you away for three years in prison . . . .  I don't believe that the sentencing commission had a case in mind where we have a person who's 38 or 39 years old, never been in trouble really, have zero points on criminal history, whether it be curiosity or just absolute perversion to utilize his computer in this way . . . .  So I'm just giving everybody fair warning, I don't like this case, I don't like the defendant very much, don't like the guidelines very much, don't like the law very much."

[6]  "Twelve months in the penitentiary is not easy for anybody.  I think you've been more than sufficiently punished for an intelligent person, and I don't think you're going to do this again."

[7]  "I state in the record that as far as I'm concerned . . . , [this] is an illegal sentence and I do not have the authority to do it under the express provisions of the guidelines.  But this case and the United States will not be any better off by putting Mr. Grosenheider in

Grosenheider now appeals the district court's denial of his motion to suppress. The United States appeals Grosenheider's sentence. We affirm the denial of the suppression motion, but vacate the sentence and remand for resentencing.

**Discussion**

I. Grosenheider's Motion to Suppress

Grosenheider contends that the district court erred in denying his motion to suppress the evidence obtained from his computer. Specifically, he argues that Meaux's search of the computer, during which Meaux viewed images of child pornography with help from and in the presence of Upgraders employees, was illegal, as was Meaux's subsequent warrantless seizure of the computer. We conclude, however, that because Siggins obtained the evidence by lawful means independent of Meaux's search or seizure, the evidence used against Grosenheider was not the "tainted fruit" of any illegality. Under the "independent source" doctrine, we conclude that this evidence should not be suppressed. We therefore affirm the denial of Grosenheider's motion.

This Court will accept a district court's factual findings on a motion to suppress based on live testimony at a suppression hearing "unless clearly erroneous or influenced by an incorrect view of the law." *United States v. Wilson*, 36 F.3d 1298, 1303 (5th Cir. 1994). When reviewing the district court's ruling, we will "view the facts in the light most favorable to the prevailing party." *United States v. Howard*, 106 F.3d 70, 73 (5th Cir. 1997).

jail for three years and I'm not going to do it."

8

Our review of the district court's interpretation and application of law is *de novo*. *See United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997).

A.  Meaux's Search of the Computer

Grosenheider first argues that Meaux's search of the computer, during which Upgraders staff helped by-pass the password lock, was illegal. At the outset, he rightly concedes that the initial search by Rowan did not violate the Fourth Amendment, which only implicates searches and seizures by governmental agents or those working for them. *See United States v. Jacobsen*, 104 S.Ct. 1652, 1656 (1984); *Blocker*, 104 F.3d at 725. He contends, however, that by breaking the password lock, the second search exceeded the scope of the initial private search, and, lacking a warrant, was therefore illegal. We do not reach the merits of this argument, but instead affirm the district court's determination that the evidence from Grosenheider's computer is admissible under the "independent source" doctrine. *See United States v. Register*, 931 F.2d 308, 311 (5th Cir. 1991) (refusing to consider whether exigent circumstances justified a warrantless entry because the independent source doctrine applied).

The exclusionary rule of the Fourth Amendment generally prohibits the introduction at trial of not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence discovered later that is derivative of an illegality, or constitutes "fruit of a poisonous tree." *Segura v. United States*, 104 S.Ct. 2280, 2284 (1984) (citing *Weeks v. United States*,

9

34 S.Ct. 341 (1914) and *Nardone v. United States*, 60 S.Ct. 266, 268 (1939)). The primary limit on this rule is that otherwise suppressible evidence will still be admitted if the connection between the alleged illegality and the acquisition of the evidence is "so attenuated as to dissipate the taint." *Nardone*, 60 S.Ct. at 268; *see also Segura*, 104 S.Ct. at 3391 (rejecting the notion "that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police'") (citations omitted). One example of this "attenuation" limit is known as the "independent source" doctrine, which permits the introduction of unlawfully discovered evidence when the police have acquired that evidence through a distinct, untainted source. *See Silverthorne Lumber Co. v. United States*, 40 S.Ct. 182, 183 (1920); *Segura*, 104 S.Ct. at 3391. Animating this doctrine is the recognition that the goal of the exclusionary rule is to put the police "in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 104 S.Ct. 2501, 2509 (1984). "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id.*

In *Murray v. United States*, 487 U.S. 533, 537 (1988), the Supreme Court held that the independent source doctrine extends to evidence "initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." Whether Meaux's assisted

10

breaking of the password lock and subsequent viewing of the JPG images on the computer's hard drive were illegal, there is no causal link between those activities and Siggins's later search and seizure of the computer pursuant to his valid warrant. Indeed, it is undisputed that Siggins obtained his search warrant by relying *solely* on the statements by the Upgraders employees to Meaux. He never mentioned to the Magistrate Judge the fact that Meaux had viewed the images, or that he still possessed the computer. Consequently, the search did not taint the Magistrate Judge's decision to issue the warrant, which the district court found "the government obtained exclusively on the basis of Rowan's initial private search of the [computer] files." *See id.* at 541 (applying independent source doctrine to later search in which affidavit made no mention of earlier unlawful search).

In addition to requiring that the decision making process of the judicial officer issuing the warrant be shielded from the earlier alleged illegality, *Murray* also mandates that the district court find that the agents would have sought the warrant even if that illegality had never taken place. *See id.* at 542-43 & n.3 ("[W]hat counts is whether the actual illegal search had any effect in producing the warrant.").[8] The district court satisfied this

_____

[8] Despite being framed as part of the independent source analysis, this requirement bleeds into the "inevitable discovery" doctrine, which renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would inevitably have been discovered by lawful means. *See* 5 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4(a) (3d ed. 1996). The reason for this slippage between the two doctrines is that they are actually two sides of the same coin. As the *Murray* Court recognized, inevitable discovery is no more than "an extrapolation" of the independent source doctrine: "Since

11

requirement by finding "credible" Siggins's testimony that the witness statements by the four Upgraders employees, all of whom agreed that the images depicted child pornography, were sufficient to prompt his decision to seek the warrant. The district court also found "[i]f Meaux had not viewed the images, the Court is certain that Siggins would nevertheless have sought and obtained a search warrant for the defendant's computer." These findings are supported by the record and are not clearly erroneous.

B.   Meaux's Seizure of the Computer

Grosenheider next argues that Meaux's seizure of the computer–his taking it from Upgraders and holding it for the four or five hour period until Siggins secured it with the search warrant–was illegal. According to Grosenheider, even if Meaux's search was reasonable, the seizure was not, and in any event the independent source doctrine does not apply to illegal seizures. We reject Grosenheider's latter argument as unsupported by precedent, and consistent with our discussion of Meaux's search, do not address the question of the seizure's reasonableness because Siggins's "re-seizure" of the computer eliminated any taint from Meaux's initial seizure.

Citing a passage in part IV of the opinion in *Segura v. United*

the tainted evidence would be admissible if discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray*, 487 U.S. at 539; *see also* LaFave at § 11.4(a) (referring to inevitable discovery as "a variation" on the independent source doctrine). We observe that the decision not to suppress the evidence in this case–with regard to both the search and seizure by Meaux–could be upheld under either doctrine.

12

*States*, 104 S.Ct. 3380, 3386-90 (1984), Grosenheider contends that the independent source doctrine is inapplicable to illegal seizures, and would have us announce a rule that the occurrence of all such seizures automatically mandates the suppression of any evidence seized. This we decline to do. In *Segura*, the Supreme Court held that two officers' illegal entry into an apartment did not require suppression of evidence later discovered at the apartment pursuant to a valid, independent search warrant. The defendants argued that during the first illegal entry the officers had "seized" all the contents of the apartment and therefore the evidence should be suppressed. In part IV of Chief Justice Burger's opinion for the Court—a portion of the opinion joined in *only* by Justice O'Connor—the following somewhat cryptic passage appears:

> "Plainly, this argument is advanced to avoid the *Silverthorne* ‹independent source' exception. If all the contents of the apartment were ‹seized' at the time of the illegal entry and securing, presumably the evidence now challenged would be suppressible as primary evidence obtained as a direct result of that entry." 104 S.Ct. at 3386.

Grosenheider argues that this language establishes that a later independent "re-seizure" can never cure an initial illegal seizure. It is far from clear, however, whether this murky dicta actually supports that proposition. Moreover, it is unlikely that such a broad and mandatory application of the exclusionary rule would be so cryptically announced. Further, only one other Justice joined Chief Justice Burger in this part of the opinion, and the language is thus not binding on lower courts. *See also* Joshua

Dressler, *A Lesson in Incaution, Overwork, and Fatigue: The Judicial Miscraftsmanship of* Segura v. United States, 26 Wм. & Mary L. Rev. 375, 416 (1985) ("Part IV is, in fact, a concurring opinion by two justices, and can be deleted without affecting the opinion."). Finally, the Court's later opinion in *Murray* specifically cites *Segura* yet never notes that it stood for the proposition Grosenheider suggests.

In fact, the *Murray* Court specifically found that an independent "re-seizure" can cure an earlier illegal seizure in the same way a valid later search can cure an earlier illegal one. *Murray*, 487 U.S. at 542. Eschewing the "metaphysical" distinction between searches and seizures, the Court observed that "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply." *Id.* In this case, it is clear that neither Siggins nor Meaux made any use of the computer while Meaux held it for five hours: Meaux simply safeguarded it, while Siggins conducted his analysis of the hard drive's contents *after* he obtained the untainted warrant and made a proper seizure. Regardless of the propriety of Meaux's seizure, there is no question that Siggins's "re-seizure" was independent from it.

Grosenheider does not specifically contend that matters would have eventuated differently had Meaux not seized the computer and taken it to his office. Nor does he explain, or anything in the

14

evidence suggest, how this might be so in light of the district court's adequately supported findings that the search warrant was "obtained exclusively" on the basis of the initial private search and would have been obtained by Siggins-who did not possess or examine the computer until he received the warrant-even if "Meaux had not viewed the images." The only theoretically possible basis on which a contention that there would have been a different ultimate outcome could be grounded is that, in the four or five hour interval between Meaux's seizure of the computer and Siggins' securing it pursuant to the warrant, Grosenheider (or someone on his behalf) might have reclaimed the computer from Upgraders and either purged it of all the child pornography or thrown it away where it could not be found.[9] The *Segura* court explicitly rejected that very sort of contention, stating:

> "It may be that, if the agents had not entered the apartment, petitions might have arranged for the removal or destruction of the evidence, and that in this sense the agents' actions could be considered the 'but for' cause for discovery of the evidence. But at this juncture, we are reminded of Justice Frankfurter's warning that '[s]ophisticated argument may prove a causal connection between information obtained through [illegal conduct] and the Government's proof,' and his admonition that the courts should consider whether '[a]s a matter of good sense . . . such connection may have become so attenuated as to dissipate the taint.' *Nardone*, 308 U.S. at 341, 60 S.Ct. at 268. The essence of the dissent is that there is some 'constitutional right' to destroy evidence. This concept defies both logic and common sense." 104 S.Ct. at 3391.

We should make clear that while we affirm the district court's

---

[9]There is nothing in the record to suggest that in this interval Grosenheider ever attempted or intended to retreive the computer or that he was ever aware that the computer had been removed from Upgraders or that the authorities were involved or interested.

15

holding that the evidence should not be suppressed, we decline to follow its lead in resolving the legality of the Meaux seizure itself.[10]  Under the independent source doctrine, we conclude that

_____

[10] We note that the Meaux seizure, lasting only for a few hours and executed merely for the purpose of guarding the computer until a warrant could be obtained, does appear reasonable. *See*, *e.g.*, *United States v. Place*, 103 S.Ct. 2637, 2641 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present."). The ultimate holding of *Place* was that a 90 minute detention of luggage was too long to be justified only by reasonable suspicion where probable cause was lacking. *Id.* at 2645 ("The length of the detention alone precludes the conclusion that the seizure was reasonable in the absence of probable cause"). That holding is inapposite here because there was probable cause from the inception of the computer's detention, and the four or five hour duration of the detention until the warrant was procured was plainly reasonable. *See*, *e.g.*, *United States v. Martin*, 157 F.2d 46, 53-54 (2nd Cir. 1998); *United States v. Respress*, 9 F.3d 483, 484-86 (6th Cir. 1993); *United States v. Lewis*, 902 F.2d 1176, 1180 (5th Cir. 1990); *United States v. Jodoin*, 672 F.2d 232, 235-36 (1st Cir. 1982) (Breyer, Circuit Judge).

The district court, however, found no exigent circumstances to justify the seizure.  Noting that Meaux watched Grosenheider drive away from Upgraders before he seized the computer, the court asserted that "there was absolutely no possibility that the evidence of child pornography was about to be deleted or destroyed" by Grosenheider. Instead, the court found justification for the search under the plain view doctrine, which we do not address.

The district court's factual findings are somewhat confusing on this point.  The district court's only response to the potential concern that if the computer were not detained Grosenheider might retrieve it and delte the images was that Meaux could have "summon[ed] another officer to stay with the computer" at Upgraders while a search warrant was sought.  The puzzling fact is that this act would have effectuated an equally "meaningful interference" with Grosenheider's possessory interests in his computer as did the actual seizure. *See Jacobsen*, 104 S.Ct. at 1656.  We find it difficult to distinguish between summoning another officer to keep the computer from leaving the store and seizing the computer itself.  As it made no difference to any legitimate interest of Grosenheider that the computer was taken to Meaux's office rather than left under police guard at Upgraders, the fact that the former rather than the latter alternative was followed, should not be the basis for suppression. *See id.* at 1661-63.  In any event, the independent source doctrine renders the legality of the seizure ultimately irrelevant.

16

any illegality that may have been part of Meaux's seizure did not affect the propriety of Siggins's actions in any way, and the evidence was therefore admissible.

II.  Grosenheider's Sentence

At the sentencing hearing, the district court departed from the applicable guideline range of twenty-seven to thirty-three months and sentenced Grosenheider to twelve months' incarceration. We review a district court's decision to depart downward from the Sentencing Guidelines for an abuse of discretion. *See Koon v. United States*, 116 S.Ct. 2035, 2047 (1996).

The Sentencing Guidelines purport to carve out a "heartland," a set of "typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt. A 4.(b).  A sentencing court may consider departing from the applicable sentence range when it encounters an atypical case, "one to which a particular guideline linguistically applies but where conduct significantly differs from the norm." *Id.*  Before it may do so, the district court must "articulate [the] relevant facts and valid reasons why the circumstances of [the] case" merit departure. *United States v. Winters* (*Winters I*), 105 F.3d 200, 208 (5th Cir. 1997); *see also United States v. Threadgill*, 172 F.3d 357, 376 (5th Cir. 1999) (defining the relevant inquiry as asking whether a case is "so unusual as to warrant a departure under the Guidelines"). Accordingly, the district court must engage in the following inquiry:

"(1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make it a special, or unusual

17

case?
(2) Has the Sentencing Commission forbidden departure based on those features?
(3) If not, has the Commission encouraged departures based on those features?
(4) If not, has the Commission discouraged departures based on those features?" *Koon*, 116 S.Ct. at 2045.

If a district court finds "an aggravating or mitigating circumstance that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," it may consider departing on that basis under the first question of the *Koon* analysis. *Id.* at 2044. When doing so, the district court must keep in mind the Commission's expectation that departure based on grounds not mentioned in the guidelines will be "highly infrequent." *Id.* at 2045. Despite this exhortation, a reviewing court will afford substantial deference to the district court's decision to depart. *See Winters I*, 105 F.3d at 205.

This deference, however, is not boundless. "Substantial deference has never been synonymous with carte blanche approval of a sentencing judgment in the face of legal error. Indeed, when reviewing the basis for a downward departure, our function as a court of appeals would be rendered superfluous if 'substantial deference' operated as a talisman to ward off scrutiny of this court." *United States v. Winters* (*Winters II*), 174 F.3d 478, 482 n.1 (5th Cir. 1999). It is clearly established that in order to justify departure based on a factor not listed in the guidelines, a district court must find on the record that "facts or circumstances of a case remove that case from the 'heartland' of typical cases encompassed within the guideline." *Id.* at 482; *see*

18

*also United States v. Harrington*, 82 F.3d 83, 87 (5th Cir. 1996).

The district court did not articulate any acceptable reason for departure, as the court itself seemed to recognize when it said that "as far as I'm concerned . . . [this] is an illegal sentence and I do not have the authority to do it under the express provisions of the guidelines." And, of course, disagreement with the guidelines or with a particular guideline, also expressed by the district court in this connection, is not an acceptable basis for departure.[11]

The closest the district court came in this case to an attempt to justify a permissible departure were its observations that all but one of the court's prior "pornography" cases had been "fairly obvious cases of perverted people that had a long track record of harm to others" (the one exception being "a young college boy who was shy, that'd gotten some pictures"), while here a psychiatrist whom defense counsel had examine Grosenheider "would have found enough to investigate further if there was an imminent problem on the surface of Mr. Grosenheider's life."[12] These observations are

---

[11]While we appreciate the district court's candor and sympathize with its frustration at what it felt to be the guidelines' overly severe treatment of the offense specified in § 2252A(a)(5)(B), the Court of Appeals lacks the luxury of affirming a properly challenged sentence which it deems illegal or illegally imposed.

[12]The Presentence Report reflects the following, to which the district court was doubtless referring, viz:

"According to Grosenheider, he has not been through counseling prior to the instant offense. The defendant provided the probation officer with a copy of a letter written by Dr. George Parker on February 22, 1998. According to this letter, it is the doctor's opinion that Grosenheider is not a pedophile and does not have pedophiliac

19

doubtless best understood in the context of the district court's earlier statement that "I don't believe that the sentencing commission had a case in mind where we have a person who's 38 or 39 years old [Grosenheider's approximate age], never been in trouble really, have zero points criminal history, whether it be curiosity or just absolute perversion to utilize his computer in this way . . . ." The court also remarked to Grosenheider, "I don't think you're going to do this again."

Insofar as the district court may have determined that this was not a "heartland" section 2252A(a)(5)(B) violation because the defendant did not have a record of "harm to others," his relevant conduct did not include "harm to others," and he did not have a propensity to molest children, we disagree. A defendant's prior criminal record is taken into account in his criminal history score, and if Grosenheider had had a record his guideline range would have been even higher. With respect to harm to others, that is no part of the section 2252A(a)(5)(B) offense, which, apart from the jurisdictional element, merely involves knowing possession. In this connection, it is unclear whether the district court's reference to its other "pornography" cases referred to section 2252A(a)(5)(B) cases or consisted mostly of cases where an element

characteristics nor does he have tendencies towards lying, manipulating, conning, or deceiving others. Dr. Parker's conclusions appear to be based on psychological assessment interviews . . . These assessments/tests are based on Grosenheider's responses and are self reporting. The evaluation does not state if any physiological (example: Abel screen) or polygraph testing was conducted. The evaluation letter does note that Grosenheider experienced several psychological traumatic events . . . ."

of the offense involved some actual sexual exploitation of children, such as, for example, 18 U.S.C. § 2251(a) (causing, transporting or seeking a minor to engage in actual or simulated sexually explicit conduct for the purpose of producing visual depiction thereof). *See also* 18 U.S.C. § 2252(a)(1)-(3) (trafficking in visual depictions of minors engaged in sexually explicit conduct).[13] The guideline for simple possession of child pornography, section 2G2.4, provides for a base offense level of 15, while the guideline applicable to the trafficking offenses, section 2G2.2, carries a base offense level of 17 and provides for a five level enhancement "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." The guideline for the causing, transporting or seeking offense (section 2251(a)), section 2G2.1, carries a base offense level of 27. Both the simple possession (section 2G2.4(c)(1)) and the trafficking (section 2G2.2(c)(1)) guidelines provide that "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1." The simple possession guideline (section 2G2.4(c)(2)) also provides that "[i]f the offense involved trafficking in material involving the sexual exploitation of a minor . . . apply § 2G2.2." It is clear that Congress established a series of distinctly separate offenses respecting child

---

[13]Indeed, it is unclear whether the court's remarks embraced pornography other than child pornography. *See, e.g.*, 18 U.S.C. §§ 1460-1463, 1465, 1466.

21

pornography, with higher sentences for offenses involving conduct more likely to be, or more directly, harmful to minors than the mere possession offense.[14]  Similarly, the guidelines clearly reflect consideration of whether and the degree to which harm to minors is or has been involved.

Our conclusion in this respect finds support in the relatively recent decisions of other Courts of Appeals which have addressed somewhat similar child pornography downward departures.  In *United States v. Barton*, 76 F.3d 499 (2d Cir. 1996), the district court departed downward in sentencing Barton on one count of "receiving" child pornography contrary to section 2252(a)(2), on the basis that he was "not involved in the commercial distribution or production of child pornography and that there was no evidence Barton was a

---

[14]Thus the § 2251(a) offense (causing, transporting or seeking a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction thereof) carries a minimum sentence of ten years and a maximum of twenty years for a first conviction, with enhancement to a fifteen year minimum and a thirty year maximum where there has been one prior conviction for the same or certain other offenses, including under any state law "relating to the sexual exploitation of children."  Section 2251(a) also provides for a thirty year minimum and life term maximum where there are two or more such prior convictions.  Similarly, the § 2252(a)(1)-(3) trafficking offenses carry a fifteen year maximum and no minimum, but with a prior conviction for the same offense or certain other offenses including under any state law "relating to . . . abusive sexual conduct involving a minor . . . or the production, possession . . . or transportation of child pornography," a five year minimum and thirty year maximum is specified.  The same sentencing range is provided for the trafficking offenses denounced in § 2252A(a)(1)-(4).  *See* § 2252A(b)(1).  The simple possession offense here in issue, § 2252A(a)(5)(B), carries a five year maximum, with no minimum (with a prior conviction for the same or a similar offense including under any state law "relating to . . . abusive sexual conduct involving a minor . . . or the production, possession . . . or transportation of child pornography," the maximum sentence becomes ten years and there is a two year minimum).  *See* § 2252A(b)(2). The same sentencing range is provided for the § 2252(a)(4) simple possession offense.  *See* § 2252(b)(2).

22

pedophile or that he had sexually abused children." *Id*. at 501. The Second Circuit reversed, noting that simple receiving was a separate offense that the Sentencing Commission "clearly foresaw . . . § 2G2.2 would extend to", and "[i]nasmuch as the offense to which Barton pleaded guilty (receipt of child pornography) did not contemplate sexual abuse of children, we find that he is not entitled to a departure merely because he did not commit an additional crime." *Id*. at 503. *United States v. Wind*, 128 F.3d 1276 (8th Cir. 1997), addressed a sentence for a single count of simple possession of child pornography contrary to section 2252(a)(4), in which the district court had departed downward on the basis of no prior criminal record and psychological testing which revealed that Wind "'. . . is not a typical child predator' or pedophile." *Id*. at 1277. The Eighth Circuit reversed, stating that "because the Guidelines take into account the gravity of a possession offense as compared with more serious forms of exploitation, Wind is not entitled to a downward departure on the ground that he did not commit, or have the tendency to commit, a worse crime." *Id*. at 1278. Finally, in *United States v. Stevens*, No. 98-30289, 1999 WL 1080167 (9th Cir. Dec. 2, 1999), the Ninth Circuit reversed a downward departure in sentencing for a single count of simple possession of child pornography contrary to section 2252A(a)(5)(B). Like this case, *Stevens* involved possession of child pornography images in the hard drive of the defendant's personal computer. The district court departed downward noting, *inter alia*, that there was "no evidence that Stevens ever abused a

specific child, or that he singled children out for specific attention," that "Stevens appears indifferent to the children he might actually encounter," that he "is not one of the offenders for whom collection of child pornography is a supplement to the molestation of real children," that he never produced or distributed child pornography, did not pay for it, did not correspond with its producers or purveyors, and did not share his collection with others or inform them of it. *United States v. Stevens*, 29 F. Supp. 2d 592, 603-05 (D. Alaska 1998).[15] The Ninth Circuit held these factors did not suffice to take the case out of the heartland of section 2252A(a)(5)(B). Relying principally on *Barton* and *Wind*, the Court stated that "we agree with the reasoning of those cases" and quoted with approval *Wind*'s statement rejecting downward departure because the defendant "did not commit, or have the tendency to commit, a worse crime" than simple possession of child pornography. *Stevens*, 1999 WL 1080167 at *6 (internal quotation marks omitted).

Agreeing with the holdings and rationales of the decisions of our sister circuits in *Barton*, *Wind*, and *Stevens*, we conclude that the fact that Grosenheider had not abused any child, and had no inclination, predisposition or tendency to do so, and had not produced or distributed any child pornography, and had no inclination, predisposition, or tendency to do so, does not suffice

---

[15]We observe that the district court opinion in *Stevens* is the principal authority on which Groseheider relies in defending the district court's downward departure.

to take his case out of the heartland of section 2252A(a)(5)(B).[16]

The district court did not articulate any acceptable basis for its downward departure, and we accordingly remand for resentencing not inconsistent with this opinion.

## Conclusion

---

[16]We do not undertake to resolve whether an isolated instance of possession of child pornography, out of mere curiosity or the like, and not either for any kind of distributive purpose or for sexual arousal or gratification from viewing it, could validly form a basis for a determination that the conduct was not within the heartland of § 2252A(a)(5)(B). The district court made no findings to this effect and indeed may have suggested that Grosenheider's possession was *not* merely the result of curiosity or the like.

Nor do we address the circumstances under which a particular defendant's § 2252A(a)(5)(B) offense might be regarded as sufficiently "aberrant behavior" on his part to support a downward departure. The district court has not purported to ground its departure on this basis, nor do its remarks contain any sufficient justification for doing so. In its introductory section regarding "Probation and Split Sentences," the Guidelines Manual states that "[t]he Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures." U.S.S.G. Ch.1, Pt.A, intro. cmt. 4(d). This statement refers only to probation, but Courts of Appeals have agreed that it may also warrant a reduction in sentence. *See* Rachel A. Hill, Comment, *Character, Choice, and "Aberrant Behavior"*, *Aligning Criminal Sentencing with Concepts of Moral Blame*, 65 U. CHI. L. REV. 975, 977 (1998) (citing *United States v. Duerson,* 25 F.3d 376, 380 (6th Cir. 1994)). This circuit has not yet defined aberrant behavior for this purpose. *See Winters I*, 105 F.3d at 206. It has observed, however, that a departure based on aberrant behavior "requires more than an act which is merely a first offense or 'out of character' for the defendant." *See United States v. Williams*, 974 F.2d 25, 26 (5th Cir. 1992). Instead, aberrant behavior "generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." *See id.* at 26-27 (quoting *United States v. Carey*, 895 F.2d 318, 325 (7th Cir. 1990)). Grosenheider's conduct apparently took place over a period of several weeks, and he may have viewed some of the images more than once. This at least casts doubt on whether there is any possibility of an aberrant behavior finding. However, our cases have not explicitly confined aberrant behavior to a short temporal frame. Their focus has been more on the level of planning and meditation that went into the act. *See Williams*, 974 F.2d at 27 (finding that the defendant's conduct did not qualify as "spontaneous" and "thoughtless" because he clearly planned his activities).

We affirm Grosenheider's conviction; we vacate his sentence and remand for resentencing not inconsistent with this opinion.

CONVICTION AFFIRMED; SENTENCE VACATED

and CAUSE REMANDED FOR RESENTENCING