IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-20200

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOSE LUIS ZAVALA

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

Defendant-Appellant Jose Luis Zavala was convicted after trial of two counts of possession with intent to distribute over five kilograms of cocaine, and two counts of conspiracy to possess with intent to distribute over five kilograms of cocaine. 21 U.S.C. §§ 841, 846; 18 U.S.C. § 2. The district court sentenced Zavala to 235 months of imprisonment, five years of supervised release, and a $5,000 fine. The district court entered judgment on February 28, 2007, and Zavala filed a timely notice of appeal.

According to Zavala, the district court erred in denying his motion to suppress certain testimony of John Moreman, an agent of the Drug Enforcement Administration (DEA). Moreman searched Zavala's cell phone after Zavala's

vehicle was stopped by the police, and he testified at trial regarding the subscriber number (the 6323 number) that he obtained through this search. In addition to claiming that Moreman's testimony regarding the 6323 number should have been suppressed, Zavala also claims that the cell phone records pertaining to the 6323 number should have been suppressed as fruit of the poisonous tree. Based on this alleged constitutional error, Zavala claims that the district court erred in denying his post-verdict motion for new trial because there is a significant possibility that Moreman's testimony regarding the 6323 number had a substantial impact upon the jury's verdict.

In response, the Government argues that (1) the police had probable cause to arrest Zavala at the time his cell phone was searched, so Moreman's testimony regarding the 6323 number was admissible because it was obtained incident to arrest; (2) Moreman had consent to search the cell phone; (3) the search of the cell phone was equivalent to a licence check; (4) Moreman's testimony regarding the 6323 number is admissible because an independent source—Javier Pompa-Hernandez—identified this number, which purged any taint associated with the constitutional violation; (5) probable cause to arrest Zavala developed after the search of his cell phone, so Moreman's testimony regarding the 6323 number was admissible under the inevitable discovery exception; and (6) any constitutional error is harmless beyond a reasonable doubt because the overwhelming weight of the evidence supports the jury's guilty verdict.

We conclude that the district court erred in denying the motion to suppress Moreman's testimony regarding the 6323 number. We agree with the district court's legal conclusion that the initial stop of Zavala's vehicle was an investigative stop based on a reasonable suspicion of drug trafficking activity, not probable cause. The search of Zavala's cell phone was not the equivalent of a license check. Because Moreman did not have consent or probable cause to

arrest Zavala at the time of the search, the search was unconstitutional. Moreman's testimony regarding the 6323 number should have been suppressed because the exclusionary rule prohibits the introduction of testimony concerning knowledge acquired during an unlawful search.

The independent source and inevitable discovery exceptions to the exclusionary rule do not apply in this case. Furthermore, the Government has not carried its burden of demonstrating that this constitutional error was harmless beyond a reasonable doubt. The jury might have convicted Zavala based, in whole or part, on the inadmissible testimony of Moreman. Thus, we reverse the judgment of the district court and remand for a new trial.

## I. Factual Background & Procedural History

### A. Factual Background

In an appeal from the denial of a motion to suppress, we may consider both the evidence admitted at the suppression hearing and at trial. United States v. Jones, 239 F.3d 716, 718 (5th Cir. 2001).

#### 1. The Co-Conspirators

Zavala was convicted of two counts of possession with intent to distribute and two counts of conspiracy. The possession and conspiracy counts related to conduct occurring during two distinct time periods: (1) conduct occurring between September 2003 and June 2004; and (2) conduct occurring on July 16, 2004. Other indicted co-conspirators relevant to this appeal include Mario Luna, Jose Rivera, and Javier Pompa-Hernandez. Both Luna and Pompa pled guilty and testified against Zavala at trial.

#### 2. The Arrest of Luna

Moreman obtained information from a cooperating source that Luna wanted to purchase 210 kilograms of cocaine in Houston. Two undercover DEA agents met with Luna in the parking lot of a restaurant. While in Luna's vehicle, Agent Felix Gonzalez observed a large amount of cash in a partially

opened bag. After agreeing to contact each other in the future regarding the drug transaction, the agents followed Luna from the restaurant to his home (the High Manor residence), where a search uncovered forty kilograms of cocaine, drug ledgers, and a cell phone. The district court denied Luna's motion to suppress the evidence discovered at Luna's home on June 25, 2004, concluding that exigent circumstances justified the warrantless entry and that Luna gave a voluntary oral and written consent to search. The constitutional validity of that search is not before us in this appeal.

According to Moreman, Luna's drug ledgers contained several entries for a man named "Gorro." The total amount associated with Gorro was 132 kilograms of cocaine. The name Gorro was also found in Luna's cell phone, and the agents later determined through subpoenaed phone records that Gorro's subscriber number (the 4886 number) belonged to Rivera. Unlike the phone records for the 6323 and the 9418 number, the phone records for the 4886 number identified the name of the individual subscriber.[1] The DEA initiated surveillance at Rivera's residence on Miramar Shores. Based on the information obtained from the search of Luna's residence, the agents suspected that Rivera was distributing cocaine in Houston.

Luna pled guilty and testified against Zavala at trial. He testified that he distributed cocaine in Houston and that Pompa transported money to Luna's boss, Daniel Elizondo, in Mexico. Luna recorded information regarding his drug transactions in a ledger, and he always used nicknames for the parties involved. He explained that Rivera's nickname was Gorro and that Zavala's nickname was Nejo. According to Luna, his cell phone contained an entry for Nejo. Only Luna, Pompa, and Elizondo knew Zavala by that nickname. Luna testified that Zavala

---

[1] The subpoenaed phone records for the 6323 and 9418 numbers did not identify the name of the subscriber because they were associated with pre-paid service plans. The only identifying information in these two sets of phone records were two different birth dates, neither of which corresponded to Zavala's actual birth date.

purchased cocaine from him on several occasions. Luna acknowledged that he never referred to Zavala by name in his drug ledger or in the factual basis of his plea agreement. Thus, Luna's first public disclosure of the identity of Nejo was at Zavala's trial. On cross examination, Zavala attacked Luna's credibility and argued that Luna identified Zavala as Nejo in order to obtain a lesser sentence.

    3.    The Arrest of Zavala and Pompa

On July 16, 2004, Moreman followed Rivera as he left his Miramar Shores residence. When he stopped at a red light, Moreman dialed the phone number for Gorro and observed that Rivera answered his cell phone.[2] The agents followed Rivera to his other residence on Tall Timbers. Rivera drove a Ford pickup and parked in the driveway. Moreman had no information—from a confidential source or otherwise—that there was going to be a drug transaction at the Tall Timbers residence on that date.

After Rivera drove the pickup into the driveway, Moreman initiated fluid surveillance of the location.[3] The agents' observations were being broadcast over police radio. Because Moreman's knowledge of the events occurring at the Tall Timbers residence was based on fluid surveillance, he was unable to recount every detail of the interaction among Rivera, Pompa, and Zavala.

Shortly after Rivera parked in the driveway of the Tall Timbers residence, Zavala and Pompa arrived in a Ford Taurus. At that time, the DEA agents did not recognize Pompa or Zavala from any previous investigation. The Taurus and the pickup parked next to each other and faced the same direction. Zavala was driving the Taurus, and Pompa was sitting in the passenger seat. The agents observed Pompa remove some unidentified items from the Taurus, place them

---

[2] Moreman never confirmed Zavala's subscriber numbers in this manner.

[3] Unlike static surveillance, where the agents constantly observe the target from a stationary position, fluid surveillance requires the agents to periodically drive by their target in different vehicles in order to avoid detection.

into a cardboard box, and put the box into Rivera's pickup. The DEA agents did not see Zavala load or move the cardboard box; he was merely standing outside the Taurus. Agent Richard Hicks testified that he could not observe the shape or the identity of the items that Pompa placed into the cardboard box. However, the DEA agents suspected that they were witnessing a drug transaction between Rivera, Pompa, and Zavala.

Shortly thereafter, the agents observed Rivera leave the Tall Timbers residence, enter a mechanic's shop down the street, and exit carrying a large pair of pliers. Rivera drove back to the Tall Timbers residence and again parked next to the Taurus. The agents suspected that Rivera retrieved the pliers in order to open a secret compartment in the Taurus containing contraband; however, the agents did not actually see what Rivera did with the pliers. Two surveillance teams followed the pickup and the Taurus as they left the Tall Timbers residence. At that time, the agents did not know the location of the cardboard box or its contents.

Because the agents suspected that they had just witnessed a drug deal, Moreman instructed a uniformed officer to stop the Taurus on Beltway 8 in Houston. Zavala did not commit a traffic violation before being pulled over. Zavala and Pompa were removed from the Taurus and immediately separated. Their wallets and cell phones were removed from their persons and placed on the roof of the Taurus. Moreman arrived on the scene shortly after the stop. Hicks and Moreman initially interviewed Pompa. A few minutes later, Hicks left Pompa and began to interview Zavala. At some later point, Moreman also interviewed Zavala.

At trial, Moreman testified that he interviewed Zavala for twenty minutes and searched his cell phone. He testified that Zavala's subscriber number was the 6323 number. He also identified the subpoenaed phone records for the 6323 number. Moreman agreed that he had to "open[] up the phone to see what the

number was." According to Hicks, Zavala gave oral consent to search the vehicle after the initial stop, but the agents did not uncover any drugs during this first vehicle search. It is unclear whether the search of Zavala's cell phone occurred before or after Zavala first gave his oral consent to search the Taurus. Instead of claiming that the search of the cell phone was consensual, Moreman testified that the search was incident to arrest.

Zavala and Pompa gave conflicting stories about the owner of the Taurus and the purpose of their trip. Both men denied the existence of any cardboard box. During the interview, Moreman realized that he recognized Pompa from an earlier undercover drug operation, which had not resulted in a drug seizure or Pompa's arrest.

After the initial stop of the Taurus, the agents approached Rivera in the front yard of his Miramar Shores residence, where they questioned him about his activity at the Tall Timbers residence. After the first vehicle search of the Taurus was unsuccessful, the agents handcuffed Zavala, put him into the back of a police car, and transported him to the Miramar Shores address where Rivera was being interviewed. Another agent drove the Taurus to the Miramar Shores address. Rivera consented to follow the officers to his Tall Timbers residence and to a search of his detached garage and shed. Zavala remained in the police car at Miramar Shores while the police searched at Tall Timbers; he was probably handcuffed and definitely not free to leave.

After a narcotics detection canine alerted to a red suitcase at Tall Timbers, Rivera confessed to the agents that Zavala and Pompa had just delivered twenty-four kilograms of cocaine to him at the Tall Timbers address earlier that day. Rivera had assisted the two men in retrieving the cocaine from the Taurus, and then he transported it back to his Miramar Shores residence. Rivera directed the agents to the twenty-four kilograms of cocaine in the attic of his Miramar Shores residence, and then told the agents that there was an extra

kilogram of cocaine stuck inside the Taurus because he was not able to remove it with the pliers. According to Rivera, Zavala initially contacted him about the cocaine transaction. Moreman testified that the canine alerted to the suitcase at the Tall Timbers residence about one hour after the initial stop of the Taurus.

After Rivera confessed, the agents asked Zavala for oral consent to search the Taurus a second time, which was given. According to Moreman, Zavala gave his second consent to search about one hour and fifteen minutes after the initial stop of the Taurus. Hicks testified that it could have been more than one hour and thirty minutes. Other testimony indicated that it could have been even longer. The second search was more thorough than the first. During this second search of the Taurus at Miramar Shores, the agents located one kilogram of cocaine in a secret compartment. Zavala also signed a consent form that allowed agents to conduct a warrantless search of his Ann Louise residence, which uncovered $27,000 in cash. Hicks testified that the search of Zavala's residence occurred about four hours after the initial stop of the Taurus.

Pompa testified that he rode with Zavala in the Taurus to deliver cocaine to the Tall Timbers residence. He also identified Zavala as Nejo. According to Pompa, he called Zavala on his cellular phone on July 15 and 16, 2004. Pompa identified Zavala's cell phone number as the 6323 number and stated that the calls he made to Zavala related to the drug transaction. He stated that he did not call Zavala on any cell phone number other than the one he identified. Pompa also testified that his cell phone was immediately confiscated by Moreman when he was stopped in the Taurus. On cross examination, Zavala questioned Pompa's credibility and motive for testifying against him.

4.    The Testimony of Skidmore

Patricia Skidmore, a DEA intelligence research specialist, analyzed the subpoenaed cell phone records from the cell phones recovered from Luna, Pompa, and Zavala. She compared the entries listed for Gorro and Nejo in

Luna's cell phone with entries from the drug ledgers and found similarities. Skidmore identified the phone records pertaining to the 6323 number. She stated that the 6323 number belonged to Zavala and was recovered "because of the cellular telephone that was seized by Agent Moreman" on July 16, 2004. Skidmore also testified that the 9418 number was associated with the entry for Nejo in Luna's cell phone. Based on her analysis of the phone records for the 9418 number and the 6323 number, she testified that those two cell phones "could have been carried by the same person." Skidmore prepared a chart, which was admitted into evidence, indicating that the 9418 number called Luna thirty-seven times, called Rivera eleven times, and called Pompa zero times. The 6323 number called Luna zero times, called Rivera eighteen times, and called Pompa forty-five times.

With respect to her analysis of Luna's drug ledgers, Skidmore identified a total of 256 kilograms of cocaine attributed to Nejo for the period of September 2003 through May 2004. The total amount of cocaine documented in Luna's ledgers exceeded 3,100 kilograms.

B.    Procedural History

1.    First Motion to Suppress

Zavala filed a motion to suppress the one kilogram of cocaine found in the Taurus and the $27,000 found at his Ann Louise residence. Zavala claimed that he was arrested without probable cause and that his second consent to search the Taurus and his consent to search his residence were tainted by this illegal detention. In response, the Government argued that (1) the consent was valid; and (2) probable cause to arrest existed at the time of the initial stop.

The district court held a pre-trial suppression hearing, which was divided into two parts. The first part of the hearing dealt with the events of June 25, 2004 (Luna's arrest), and the second part dealt with the events of July 16, 2004 (Zavala's and Pompa's arrest). On July 16, 2004, Zavala's vehicle was searched

twice and his home was searched once. According to the Government, Zavala gave oral consent for the two vehicle searches and written consent for the residence search. After the first vehicle search failed to produce any drugs, the district court found that the agents handcuffed Zavala, placed him into the police car, and detained him for one hour and thirty minutes before Rivera confessed to Zavala's participation in the twenty-five kilogram drug transaction. According to the district court, probable cause to arrest Zavala did not develop until Rivera confessed.

After the district court heard the testimony at the suppression hearing, it considered the arguments of counsel. The prosecutor's central argument was that the initial stop of the Taurus was based on a reasonable suspicion of drug trafficking activity, not probable cause. The prosecutor argued that this reasonable suspicion was heightened during the questioning of Zavala and Pompa, which justified their continued detention, and it rose to the level of probable cause after Rivera confessed to the drug transaction. The prosecutor briefly mentioned the possibility that probable cause to arrest existed at the time of the initial stop. However, he later informed the district court that it was the Government's position that the initial stop was a Terry stop. The prosecutor argued that a one hour and thirty minute detention was necessary to confirm or dispel the reasonable suspicion that justified the initial stop of the Taurus.

The district court ruled that the initial investigative vehicle stop was permissible under Terry v. Ohio, 392 U.S. 1 (1968), based on a reasonable suspicion of drug trafficking activity; Zavala's one hour and thirty minute detention developed into a de facto arrest without probable cause; Zavala's second consent to search his vehicle and consent to search his home, which occurred after his de facto arrest, were not voluntary and were not independent acts of free will; and one kilogram of cocaine found after the second search of his vehicle and $27,000 in cash found at his home would be suppressed.

2.      Second Motion to Suppress

After the district court granted Zavala's first motion to suppress the one kilogram of cocaine and the $27,000, Zavala filed a second motion to suppress three cell phones confiscated from Zavala on July 16, 2004.  The Government argued that the cell phones were admissible because they were recovered at the time of the first vehicle search, which the district court had previously held was constitutional.  The district court did not conduct a hearing on this second motion to suppress, but instead carried the motion until the trial.

At a pre-trial conference regarding the second motion to suppress, the Government stated that it would not seek to introduce the physical cell phones, including the cell phone associated with the 6323 number.  Zavala stated that his motion would be moot if the Government did not introduce the physical phones or the fact that Zavala possessed those phones.

At trial, the Government did not seek to admit the physical cell phones into evidence.  However, the Government argued that Moreman should be able to testify regarding his search of one cell phone and his observation of the 6323 number.  The Government stated that it was "critical to our case to show that he had a phone on him showing contact with some of the individuals and not other of the individuals." Zavala objected to the introduction of this evidence.  After concluding that Zavala's first consent to search his vehicle extended to a search of his cell phone, the district court ruled that Moreman's testimony regarding the 6323 number was admissible.

3.      Motion for New Trial

During deliberation, the jury submitted Jury Note #2 to the district court: "It is a fact that phone 281-XXX-9418 and 832-XXX-6323 belong to Jose Luis Zavala?  We don't understand the objections from lawyers on it."  In response, the district court stated that it could not answer this factual question, that the arguments of counsel are not evidence, and that the jury must refer to its own

recollection and interpretation of the evidence presented at trial. After the jury returned a guilty verdict, Zavala filed a motion for new trial, arguing that the district court erred in admitting Moreman's testimony regarding the 6323 number. The motion was denied without reasons.

## II. Analysis

### A.      Standard of Review

The district court's legal conclusions under the Fourth Amendment are reviewed de novo, but its factual findings are reviewed for clear error. United States v. Ibarra, 493 F.3d 526, 530 (5th Cir. 2007). "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir. 2001). "We may consider all of the evidence presented at trial, not just that presented before the ruling on the suppression motion, in the light most favorable to the prevailing party, which in this case is the Government." Ibarra, 493 F.3d at 530.

### B.      Probable Cause to Arrest

The Government argues that the DEA agents had probable cause to arrest Zavala when his cell phone was searched by Moreman. A district court's legal conclusions, including determinations of reasonable suspicion and probable cause, are reviewed de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996). We agree with the district court that the agents had a reasonable suspicion of drug trafficking activity that was sufficient to justify an investigative vehicle stop, but this suspicion did not rise to the level of probable cause before Zavala's cell phone was searched.

An investigative vehicle stop is permissible under Terry only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. United States v. Martinez, 486 F.3d 855, 861 (5th Cir. 2007). Although a "mere hunch" will not suffice, a "reasonable suspicion" need not rise to the level of probable cause. United States v. Lopez-Moreno, 420 F.3d

420, 430 (5th Cir. 2005). To determine the propriety of such a stop, we "first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing Terry, 392 U.S. at 19-20).

Based on the information obtained from Luna and the DEA surveillance team, Moreman had a reasonable suspicion that Pompa and Zavala were engaged in drug trafficking activity at the Tall Timbers residence. Thus, it was constitutionally permissible for Moreman to order the uniformed officer to stop the Taurus despite the fact that Zavala did not commit any traffic violation. See United States v. Holloway, 962 F.2d 451, 459 n.22 (5th Cir. 1992) (stating that reasonable suspicion is based on the "collective knowledge and experience of the officers involved").

In United States v. Ibarra-Sanchez, we held that there was reasonable suspicion at the time of the initial vehicle stop based on "a veritable cornucopia of factors suggesting drug-related activity," but probable cause for a warrantless search did not arise until the police officers actually smelled marijuana upon approaching the vehicle. 199 F.3d 753, 758-60 (5th Cir. 1999). In Ibarra-Sanchez, a five-month DEA surveillance operation indicated that (1) the suspects had made numerous phone calls to phone numbers associated with other DEA investigations; (2) the suspect's trash contained several plastic bags covered in duct tape, plane tickets to Mexico, and bank statements with large monthly deposits even though the suspects had no discernable employment; (3) a police canine positively identified the plastic bags as having contained currency; (4) there was heavy foot and vehicle traffic between the suspects' residence and another suspected stash-house they maintained; (5) approximately six vehicles, some with temporary tags and some associated with other DEA investigations, would drive between the suspects' houses and would park in front of them for

weeks at a time; and (6) three men loaded several large objects, which appeared to be duffel bags, into a van in the dark before being stopped by police. Id. at 756-57, 758-59. Zavala argues that under the reasoning of Ibarra-Sanchez, the agents had reasonable suspicion for the initial stop of the Taurus, but they did not have probable cause to arrest him and search his cell phone until Rivera confessed about one hour and thirty minutes later.

The Government argues that the agents had probable cause to arrest Zavala at the time of the search, so Moreman was entitled to conduct a search of the cell phone incident to arrest without a warrant or consent. See United States v. Finley, 477 F.3d 250, 259-60 (5th Cir.), cert. denied 127 S. Ct. 2065 (2007) (holding that the police officer could search the defendant's cell phone for call records and text messages as a search incident to a lawful arrest). Under the Fourth Amendment, a warrantless arrest must be based on probable cause. United States v. Castro, 166 F.3d 728, 733 (5th Cir. 1999) (en banc). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." Id.

The district court correctly determined that the agents did not have probable cause to arrest Zavala at the time that Moreman searched Zavala's cell phone. The evidence obtained from Luna caused the DEA to put Rivera under surveillance; Zavala did not become a focus of the investigation until the agents fortuitously saw him participate in a suspicious transaction with Rivera and Pompa at the Tall Timbers residence. No agent recognized Zavala from a previous investigation. Zavala had not been linked to Luna's ledger through the 9418 number because those phone records did not identify the individual subscriber. No source informed the DEA that a drug transaction would occur at the Tall Timbers residence on July 16, 2004. No agent identified the objects

being placed in the cardboard box. No agent saw Zavala participate in the loading or movement of the cardboard box. After the stop, Moreman recognized Pompa from a previous DEA operation, but that operation had not resulted in a seizure of drugs or the arrest of Pompa. See Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). Although Zavala and Pompa gave conflicting answers to several interview questions, this could not "serve as the catalyst to convert mere reasonable suspicion to probable cause." Cf. Holloway, 962 F.2d at 461.

At the time Moreman searched Zavala's cell phone, the agents had a reasonable suspicion of drug trafficking activity, but they did not have probable cause to arrest Zavala and charge him with a crime. See Maryland v. Pringle, 540 U.S. 366, 371 (2003) (stating that the "substance of all the definitions of probable cause is a reasonable ground for belief of guilt") (quotation omitted). Rivera's subsequent confession gave the agents probable cause to arrest Zavala, but that probable cause did not develop until after Moreman's search of Zavala's cell phone. See Smith v. Ohio, 494 U.S. 541, 543 (1990) ("[I]t is axiomatic that an incident [to arrest] search may not precede an arrest and serve as part of its justification.") (quotation omitted). Because Moreman did not have probable cause to arrest Zavala at the time he searched the cell phone, the search was not justified under an "incident to arrest" theory.

C. Consent to Search

"A search may be conducted without either probable cause or a warrant if it is conducted pursuant to consent." United States v. Richard, 994 F.2d 244, 250 (5th Cir. 1993). "When the government relies upon consent as the basis for a warrantless search," however, "they have no more authority than they have apparently been given by the consent." United States v. Mendoza-Gonzalez, 318 F.3d 663, 666 (5th Cir. 2003). "Under the Fourth Amendment, '[t]he standard

for measuring the scope of a suspect's consent . . . is that of 'objective' reasonablenessSSwhat would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 667 (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Thus, where a person consented to the search of his vehicle, we have held the consent did not extend to a search of himself. See United States v. Jenson, 462 F.3d 399, 407 (5th Cir. 2006).

Because the initial stop of Zavala was based on reasonable suspicion alone, the police were not permitted to search the car or Zavala absent consent. The district court found that Zavala consented to the search of his car and that his consent extended to the phones. We disagree. Given that Zavala's phones were immediately removed from his person and placed on the roof of the vehicle, it was not objectively reasonable to understand his consent to search the car as consent to search the phones.

Neither was Moreman's search of Zavala's phone permissible under Terry. Without a warrant or consent, Terry permits only a limited pat-down search to determine whether the suspect is carrying a weapon.[4] Jenson, 462 F.3d at 407. "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993). By searching Zavala's cell phone for the 6323 number, Moreman's search was beyond the scope of a lawful protective search. Thus, Moreman's search of the phones without a warrant, without probable cause, and absent consent violated the Fourth Amendment.

D.    License Check

---

[4] Under Terry, the police officer could order Zavala to empty his pockets and place the contents on the roof of the Taurus to confirm that he was not carrying a weapon. See United States v. Reyes, 349 F.3d 219, 225 (5th Cir. 2003) ("[The police officer's] request that defendant empty his pockets and lift his shirt was permissible under Terry.").

During a traffic stop, a police officer may examine a driver's license and vehicle registration, run a computer check on the driver and the vehicle, and question the driver about a wide range of matters, including those unrelated to the purpose of a routine traffic stop. Brigham, 382 F.3d at 507-08. The Government argues that the search of Zavala's cell phone was equivalent to running a license check during a traffic stop. Finley indicates that a search of a cell phone after an investigative vehicle stop is appropriate if the police officer has either a warrant or probable cause to arrest. 477 F.3d at 259-60. In holding that a police officer may search a cell phone in the case of a lawful custodial arrest, Finley cited to cases holding that "[t]he permissible scope of a search incident to a lawful arrest extends to containers found on the arrestee's person." Id. at 260.

In the case of a traffic stop, a police officer must ensure that the driver does not have a warrant or a suspended license, and that the vehicle is registered and not reported stolen. These checks are routine and quickly performed. Additionally, state law requires a driver to carry a driver's license and proof of insurance. See Atwater v. City of Lago Vista, 532 U.S. 318, 324 (2001) (citing TEX. TRANSP. CODE §§ 521.025, 601.053). Because state law requires a driver operating a motor vehicle to surrender his driver's license and proof of insurance when asked by a police officer, that person does not have a reasonable expectation of privacy regarding those items after being pulled over for a traffic violation. See TEX. TRANSP. CODE §§ 521.025(b), 601.053(a), (b); see also Finley, 477 F.3d at 258 (stating the test for when a defendant has a reasonable expectation of privacy sufficient to contest the constitutional validity of a search).

Unlike a driver's license and vehicle registration, which are typically issued by a governmental entity, cell phones contain a wealth of private information, including emails, text messages, call histories, address books, and

subscriber numbers. Zavala had a reasonable expectation of privacy regarding this information. See Finley, 477 F.3d at 258-59. A cell phone is similar to a personal computer that is carried on one's person; Finley indicates that mere possession of a cell phone gives rise to a reasonable expectation of privacy regarding its contents. See id. A police officer's license check during a traffic stop is "within the scope of investigation attendant to the traffic stop" and is not triggered by any particularized suspicion that the check will produce evidence of a crime. Brigham, 382 F.3d at 508. In this case, Moreman's search of Zavala's cell phone was "general rummaging in order to discover incriminating evidence." See Florida v. Wells, 495 U.S. 1, 4 (1990). The Government's analogy between searching a cell phone during an investigative stop and running a license check during a traffic stop is simply not apropos.[5]

Zavala's vehicle was stopped because of a reasonable suspicion of drug trafficking activity. Just as the agents could not search Zavala's vehicle for contraband based on this suspicion without consent or probable cause, they could not search Zavala's cell phone for other incriminating evidence without consent or probable cause. See Finley, 477 F.3d at 259-60 (if the police officer has probable cause to arrest, then he may "look for evidence of the arrestee's crime on his person in order to preserve it for use at trial") (citing United States v. Robinson, 4154 U.S. 218, 233-34 (1973)).

E.      Independent Source Exception

"The primary limit on the exclusionary rule is that otherwise suppressible evidence will still be admitted if the connection between the alleged illegality and the acquisition of evidence is so attenuated as to dissipate the taint." United

---

[5] The 6323 number was not plainly visible to Moreman. He had to open the cell phone and manipulate it in order to retrieve the subscriber number. Thus, Moreman's testimony regarding the 6323 number is not admissible under a plain view theory. See United States v. Hill, 19 F.3d 984, 989 (5th Cir. 1994).

States v. Grosenheider, 200 F.3d 321, 327 (5th Cir. 2000) (quotation omitted). The independent source exception allows the "introduction of unlawfully discovered evidence when the police have acquired that evidence through a distinct, untainted source." Id. "Animating this doctrine is the recognition that the goal of the exclusionary rule is to put the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." Id. (citation omitted).

The Government argues that Moreman's testimony regarding the 6323 number is admissible under the independent source exception because Pompa testified at trial that Zavala's cell phone number was the 6323 number. The independent source doctrine does not purge the taint associated with the constitutional violation in this case because no independent source testified that the cell phone Zavala was carrying at the time of his arrest was associated with the 6323 number.

For the independent source exception to apply, the evidence obtained through the independent source must be "identical to the evidence unlawfully acquired."[6] Murray, 487 U.S. at 538; see also United States v. Johnson, 380 F.3d 1013, 1016 (7th Cir. 2004) ("same evidence"); United States v. Hawley, 855 F.2d 595, 603 n.3 (8th Cir. 1988) ("identical evidence"). In this case, the prosecutor himself stated that it was "critical to our case to show that [Zavala] had a phone on him showing contact with some of the individuals and not other of the individuals." Moreman testified that he examined the phone that Zavala possessed when he was arrested, and that phone was associated with the 6323

---

[6] Because we typically apply the independent source exception in cases involving physical evidence, as opposed to testimonial evidence, the "identical" requirement is usually not an issue. See, e.g., Moore, 329 F.3d at 404-05 (marijuana and firearm would have been discovered through an untainted, independent source); Runyan, 290 F.3d at 235-36 (child pornography); Grosenheider, 200 F.3d at 328 (child pornography); United States v. Register, 931 F.2d 308, 311 (5th Cir. 1991) (cocaine, money, scales, and drug paraphernalia).

number. Pompa merely testified from memory that he remembered Zavala's cell phone number as being the 6323 number; he did not explain how he acquired this information. The testimony of Moreman is substantively different from the testimony of Pompa. Moreman's testimony is more probative of the ownership of the 6323 number because it was based on his first-hand observation of the cell phone in Zavala's possession at the time of his arrest.

The core rationale underlying the exclusionary rule is the deterence of police misconduct. United States v. Lamas, 930 F.2d 1099, 1102 (5th Cir. 1991). "The corollary to this principle is that the prosecution must not be put in a better position as a result of the police illegality." Id. In addition to the substantive difference between the testimony of Moreman and Pompa, there is also a difference in the credibility of these two witnesses. Of course, the credibility of any two witnesses will never be identical, and the independent source exception does not always require that both the credibility of the witnesses and the substance of their testimony be identical. In this case, however, we are mindful of our admonishment to criminal juries in this circuit that the testimony of an accomplice "must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses." FIFTH CIRCUIT CRIMINAL JURY INSTRUCTIONS ¶ 1.14 (2001); see also United States v. Goff, 847 F.2d 149, 161 n.13 (5th Cir. 1988).

Pompa, an indicted co-conspirator, provided the only other testimony linking Zavala to the 6323 number. Zavala's core trial strategy revolved around (1) challenging the credibility and motives of Luna and Pompa; and (2) suppressing Moreman's testimony regarding the 6323 number. The admission of Moreman's testimony both corroborated the testimony of Luna and Pompa and served as an independent basis for linking Zavala to the other co-conspirators. After considering the differences between the substance of the statements and the credibility of the witnesses, we find that giving the

prosecution the benefit of the independent source exception would put it in a better position than it would have been in but for the police misconduct.

## F. Inevitable Discovery Exception

The Government argues that probable cause to arrest developed after the cell phones were searched because Rivera's confession implicated Zavala, so the 6323 number would have been discovered incident to arrest under the inevitable discovery doctrine. See Finley, 477 F.3d at 260 (holding that a police officer may conduct a warrantless search of a cell phone on a person if the search is incident to arrest). The inevitable discovery doctrine applies if the Government demonstrates by a preponderance of the evidence that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation.[7] See Lamas, 930 F.2d at 1102.

The Government argues that Zavala's one hour and thirty minute detention was permissible under Terry and did not develop into a de facto arrest without probable cause. See Brigham, 382 F.3d at 507 (noting that a Terry detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges"). According to the Government, the agents detained Zavala to effectuate the purpose of the initial stop and to allow time for other agents to interview Rivera. Because Pompa and Zavala told conflicting stories after the initial stop, the agents arguably had further reasonable suspicion to detain them. United States v. Valadez, 267 F.3d 395, 398 (5th Cir. 2001)

---

[7] The inevitable discovery test in this circuit is more favorable to the Government than the test in other circuits. See United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006) (rejecting the "reasonable probability" formulation).

("[O]nce an officer's suspicions have been verified or dispelled, the detention must end . . . .").

The inevitable discovery doctrine asks whether there is a reasonable probability that the evidence in question would have been discovered in the absence of the police misconduct. See Lamas, 930 F.2d at 1102. We have previously determined that Moreman's search of Zavala's cell phone was a constitutional violation. Now we must now examine whether Zavala's one hour and thirty minute detention before Rivera's confession was a constitutional violation. If it was, then we must factor this legal conclusion into our inevitable discovery analysis.

Zavala's detention, which exceeded one hour and thirty minutes, morphed from a Terry detention into a de facto arrest. See Ibarra-Sanchez, 199 F.3d at 761. He was handcuffed, placed in a police car, transported to different locations, and was not free to leave. See Dunaway v. New York, 442 U.S. 200, 212-13 (1979). But cf. United States v. Jordan, 232 F.3d 447, 450 (5th Cir. 2000) (handcuffing does not automatically convert an investigatory detention into an arrest requiring probable cause). Although we have held that the police officer can detain a defendant after a traffic stop until a computer check comes back clean, see, e.g., United States v. Zucco, 71 F.3d 188, 191 (5th Cir. 1995) (nine minute detention), we have never held that a police officer may detain a defendant for one hour and thirty minutes until a full-blown drug investigation is completed. See United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993) ("We recognize that a detention may be of excessively long duration even though the officers have not completed and continue to pursue investigation of the matters justifying its initiation."); United States v. Place, 462 U.S. 696, 709-10 (1983) ("Thus, although we decline to adopt any outside time limitation for a permissible Terry stop, we have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts

presented by this case."). In this case, the agents detained Zavala for one hour and thirty minutes without knowing whether Rivera would confess or whether drugs would be discovered. Based on the particular facts of this case, the length of Zavala's detention exceeded the outer bounds of a valid Terry detention.[8] Zavala (and his cell phone) should have been released after the first search of the Taurus failed to uncover any drugs.

Absent the unconstitutional detention of Zavala before Rivera's confession, Moreman's testimony regarding the 6323 number is not admissible under the inevitable discovery exception because the search of Zavala's cell phone is speculative.[9] See United States v. Cherry, 759 F.2d 1196, 1205 n.10 (5th Cir. 1985) (stating that "the exception involves no speculative elements but focuses on demonstrated historical facts") (quotation omitted). For the inevitable discovery exception to apply, "the alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized." Id.

Because the Government raised its inevitable discovery argument in a footnote, it did not explain how the agents would have obtained the 6323 number from Zavala's cell phone in the absence of police misconduct. If (1) Zavala's cell phone was not searched at the time of the initial stop and (2) Zavala was not detained after the first search of the Taurus failed to uncover any drugs, it can hardly be said that the alternate means of obtaining the 6323 number from

---

[8] In its oral ruling at the suppression hearing, the district court made the factual finding that Zavala was detained for one hour and thirty minutes before Rivera confessed. This factual finding is not clearly erroneous. We express no opinion on whether a Terry detention could exceed one hour and thirty minutes based on a different set of facts.

[9] We reject Zavala's argument that the phone records pertaining to the 6323 number should be suppressed. These records are admissible under the inevitable discovery exception because there is a reasonable probability that Skidmore would have subpoenaed them based on the untainted information provided by Pompa. In the district court, Zavala waived this issue by stating that "the [Government] can get to the phone records through the ledgers [of Luna] or [the testimony] of Pompa-Hernandez."

Zavala's cell phone was in existence or imminent at that time.[10] See id. at 1204 (inevitable discovery test should be applied at the time of the police misconduct). The Government did not even propose a hypothetical scenario of how this information would have been obtained. See United States v. Holmes, 505 F.3d 1288, 1293-94 (D.C. Cir. 2007) (finding that the Government's hypothetical scenario was "nothing more than a possibility" and did not satisfy the inevitable discovery test); United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1998) (finding that it was impossible to conclude that the officer would have used a drug-detecting canine to establish probable cause to search). The Government has not established by a preponderance of the evidence that there is reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct. See Nix v. Williams, 467 U.S. 431, 444 (1984); see also United States v. Goree, 365 F.3d 1086, 1088 n.2 (D.C. Cir. 2004) ("The government based its inevitability claim on the testimony of Officer Maradiaga and Sergeant Caldwell, each of whom testified that, but for Maradiaga's mistake about consent, he would have stopped the search and sought a warrant. We are dubious that such conjectural testimony is adequate to support applying the doctrine to this case."); United States v. Thomas, 955 F.2d 207, 209 (4th Cir. 1992) ("To argue the evidence in Room 416 inevitably would have been discovered, the government has relied on a string of conjecture . . . .").

Based on the record before us, it is impossible to speculate whether in the absence of police misconduct, the police would have dispatched a drug-detecting

---

[10] This case falls outside the mine run of cases in this circuit applying the inevitable discovery exception. For example, absent these two constitutional violations, Zavala would not have remained in the custody or control of the police until his phone was legally searched. See, e.g., United States v. Seals, 987 F.2d 1102, 1108 (5th Cir. 1993) (inevitable discovery of firearm and cocaine in a vehicle through normal inventory procedures). Furthermore, at the time of the illegal search, the agents were not in the process of obtaining a warrant because they did not have probable cause. See, e.g., Lamas, 930 F.2d at 1104.

canine to the scene, or would have followed the Taurus until Rivera's confession, or would have obtained a warrant and located Zavala while he possessed the cell phone. Because the Government has not carried its burden, it is not entitled to the benefit of the inevitable discovery exception.

G.    Harmless Beyond a Reasonable Doubt

A constitutional error may be deemed harmless if the beneficiary of the constitutional error proves beyond a reasonable doubt that the error complained of did not contribute to the verdict. See Neder v. United States, 527 U.S. 1, 15 (1999) (citing Chapman v. California, 386 U.S. 18, 24 (1967)); United States v. Brathwaite, 458 F.3d 376, 383 (5th Cir. 2006). The trial testimony, statements made by the prosecutor, and a question from the jury demonstrate that Moreman's testimony regarding the 6323 number played a central role in the Government's case.

Moreman's testimony regarding the 6323 number linked Zavala to Rivera and Pompa. It also tainted the Government's evidence regarding Zavala's other subscriber number (the 9418 number) because Patricia Skidmore, an intelligence research specialist for the DEA, testified that the 6323 number and the 9418 number could have been carried by the same person. When combined with Moreman's inadmissible testimony, Skidmore's testimony regarding the 9418 number linked Zavala to Rivera and Luna. Skidmore used the phone records of the 6323 and 9418 numbers to create a chart showing common phone calls between the co-conspirators, which allowed the Government to argue that they were all participating in a conspiracy to distribute cocaine. During closing argument, the prosecutor urged the jurors to review these phone records.

The jury specifically referenced Zavala's cell phone numbers in Jury Note #2. During a bench conference, the prosecutor stated that the admission of Moreman's testimony was "critical to our case." Moreman's testimony linked Zavala to the 6323 number, Skidmore's testimony linked Zavala to the 9418

number, and the anonymous phone records of these two numbers linked Zavala to Luna, Rivera, and Pompa. Although Skidmore reached her conclusions by relying on a comparison of the phone records of the 6323 and 9418 numbers, these admissible phone records did not identify the name of the individual subscriber. Moreman's testimony essentially stamped these anonymous phone records with a name. Skidmore's testimony is tainted by the constitutional violation because the jury might have linked Zavala to the 6323 phone records based on Moreman's testimony, and then linked Zavala to the 9418 phone records based on Skidmore's testimony.

The jury might have linked Zavala to his co-conspirators based solely on Moreman's inadmissible testimony, without relying on the testimony of Luna and Pompa. Alternatively, the jury might have given more credence to the testimony of Luna and Pompa because it was corroborated by the testimony of Moreman. The error was not harmless beyond a reasonable doubt because the jury might have convicted Zavala based, in whole or part, on the inadmissible testimony of Moreman.

### III. Conclusion

The exclusionary rule prohibits the introduction of testimony concerning knowledge acquired during an unlawful search. See Murray, 487 U.S. at 536. The district court erred in denying Zavala's motion to suppress Moreman's testimony regarding the 6323 number. Moreman did not have consent or probable cause to search the cell phone, and the search was not the equivalent of a license check. The independent source exception does not apply because Pompa's testimony regarding the 6323 number is not identical to the evidence unlawfully acquired. The inevitable discovery exception does not apply because Moreman's search of the cell phone is speculative absent the unconstitutional detention of Zavala before Rivera's confession. It is inappropriate to give the Government the benefit of these two exceptions because it would put the

Government in a better position than it would have been in but for the police misconduct. We reverse the judgment of the district court and remand for a new trial.

REVERSED AND REMANDED.