[No. 41014-1-II. Division Two. June 26, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. SHAWN D. HINTON, *Appellant*.

*John A. Hays*, for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *Sean M. Brittain, Deputy*, for respondent.

¶1 PENOYAR, J. — A police detective acquired the iPhone[1] of a suspected drug dealer. While the phone was in the detective's possession, a text message from Shawn Hinton appeared on the iPhone's screen, asking the dealer to call Hinton. Posing as the dealer, the detective replied to Hinton's text message. The two men proceeded to exchange several text messages, eventually arranging a drug transaction, which led to Hinton's conviction for attempted possession of heroin. Hinton appeals his conviction, arguing that the detective violated article I, section 7 of the state constitution and the Fourth Amendment to the federal constitution when he used the dealer's iPhone to read and to reply to text messages that Hinton sent to the dealer. Because neither article I, section 7 of the Washington Constitution nor the Fourth Amendment to the United States Constitution protect Hinton's text messages on the recipient's iPhone, we affirm.

## FACTS

¶2 On November 3, 2009, when Detective Kevin Sawyer arrived to begin his shift, several officers gave Sawyer an iPhone they had seized from Daniel Lee, who had been arrested earlier that day on drug charges.[2] At one point while Sawyer had the iPhone in his possession, he heard a "ding" from the iPhone, indicating that it had received a new text message. Report of Proceedings (RP) at 20. Sawyer picked up the iPhone and viewed the following message, which appeared in its entirety on the iPhone's screen: "Hey whats up dogg can you call me i need to talk to you." Clerk's Papers (CP) at 28. The text message was from "Z-Shawn Hinton." RP at 22. Sawyer knew Hinton from past arrests.

---

[1] The iPhone is a "smartphone" with "computer-like capabilities" that enables users to browse the Internet, to send and receive e-mails and text messages, and to take photographs, among many other functions. *See, e.g., In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 374 (D.N.J. 2010).

[2] The basis of the officers' seizure of Lee's iPhone (e.g., warrant, search incident to arrest, booking/inventory search) is not clear from the record. Whether Lee's iPhone was lawfully seized is not at issue in this case.

¶3 Sawyer responded to Hinton's text message using Lee's iPhone. The following text message exchange occurred:

[Sawyer]: Can't now. What's up?

. . . .

[Hinton]: I need to talk to you about business. Please call when you get a chance.

. . . .

[Sawyer]: I'm about to drop off my last.

. . . .

[Hinton]: Please save me a ball. Please? I need it. I'm sick.[3]

RP at 22-25. Through a series of additional text messages, the two men agreed to meet for a drug transaction in a grocery store parking lot. Sawyer contacted Hinton in the parking lot and arrested him. After the arrest, Sawyer called the phone number associated with Z-Shawn Hinton in Lee's iPhone,[4] and Hinton's cell phone rang.

¶4 The State charged Hinton with attempted possession of heroin.[5] Hinton moved to suppress "any and all evidence obtained as a result of the search of the cell phone taken from Daniel Lee." CP at 7. He argued, in relevant part, that the detective's actions violated Washington Constitution article I, section 7 and the Fourth Amendment. In response, the State argued that Hinton "did not have a legitimate expectation of privacy in the text messages." CP at 18.

¶5 Sawyer, the State's only witness at the suppression hearing, testified as we set out above. The trial court denied Hinton's motion to suppress, stating:

---

[3] Sawyer testified at the suppression hearing that a "ball" is "a drug weight" equivalent to "approximately 3.54 grams" and that "sick" is "a drug term" that describes "when people are coming off the high and . . . looking to get some more." RP at 8, 10.

[4] To discover the phone number associated with Z-Shawn Hinton, Sawyer had to navigate to the contacts folder on Lee's iPhone. It is unclear from the record when Sawyer accessed the contacts folder to retrieve Hinton's phone number.

[5] A violation of RCW 69.50.407 and RCW 69.50.4013(1); *see also* former RCW 69.50.204(b)(13) (1993) (heroin is a schedule I controlled substance).

Under *State v. Wojtyna*, 70 Wn. App. 689[, 855 P.2d 315] (1993), there is no expectation of privacy in a communication transmitted to a device such as an iPhone. Text messages are an active form of communication. Whoever is sending a text message does not know who is observing the message. The sender of a text message makes an assumption that the message will be received by the person intended. The communication is not rendered private based on that assumption.

CP at 30.

¶6 Hinton stipulated that he committed the crime. The trial court convicted him at a stipulated facts trial. Hinton appeals.

## ANALYSIS

¶7 Hinton argues that he had a reasonable expectation of privacy in the text message that he sent to Lee's iPhone. It is important to note that Hinton is arguing a privacy interest in another's electronic device, not his own. He argues that when Sawyer read Hinton's text message without having obtained a warrant, Sawyer conducted a search that violated Washington Constitution article I, section 7, and the Fourth Amendment. He asserts, therefore, that the trial court should have suppressed the fruits of Sawyer's illegal search, including "the officer's communications with [Hinton], as well as the presence of [Hinton] at the fake drug sale the officer arranged." Appellant's Br. at 16. This argument fails because the text messages as received on Lee's iPhone are not protected under either the state or the federal constitution.

■■ ¶8 We review a trial court's legal conclusions on a motion to suppress de novo. *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). We turn first to the state constitutional challenge. *State v. Afana*, 169 Wn.2d 169, 176, 233 P.3d 879 (2010).

34

A. HINTON'S TEXT MESSAGES FOUND ON LEE'S PHONE ARE NOT
PROTECTED UNDER ARTICLE I, SECTION 7 OF THE WASHINGTON
CONSTITUTION

 ¶9 Article I, section 7 of the Washington Constitu-
tion provides that "[n]o person shall be disturbed in his
private affairs, or his home invaded, without authority of
law." This provision protects a person's home and private
affairs from warrantless searches. *State v. Carter*, 151
Wn.2d 118, 125, 85 P.3d 887 (2004). It is well settled that
article I, section 7 affords qualitatively different—and
potentially broader—protections than those provided by the
Fourth Amendment to the United States Constitution.
*State v. McKinney*, 148 Wn.2d 20, 26, 60 P.3d 46 (2002)
(citing *City of Seattle v. McCready*, 123 Wn.2d 260, 267, 868
P.2d 134 (1994)). But merely holding that a given state
constitutional provision affords enhanced protection in a
particular context does not necessarily lead to the same
result in a different context. *McKinney*, 148 Wn.2d at 26
(quoting *State v. Johnson*, 128 Wn.2d 431, 446, 909 P.2d 293
(1996)). We must determine "whether the language of the
state constitutional provision and its prior interpretations
actually compel a particular result." *McKinney*, 148 Wn.2d
at 26; *McCready*, 123 Wn.2d at 267.

 ¶10 When dealing with a challenge under article I,
section 7, we use a two-step analysis. *State v. Valdez*, 167
Wn.2d 761, 772, 224 P.3d 751 (2009). First, we must
determine whether the State has intruded into a person's
private affairs. *Valdez*, 167 Wn.2d at 772 (quoting *York v.
Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 306, 178
P.3d 995 (2008)). If the State has disturbed a privacy
interest, the second step in our analysis asks whether the
authority of law required by article I, section 7 justifies the
intrusion, which is satisfied only by a valid warrant, limited
to a few jealously guarded exceptions. *Valdez*, 167 Wn.2d at
772 (quoting *York*, 163 Wn.2d at 306).

 ¶11 Private affairs are " 'those privacy interests
which citizens of [Washington] have held, and should be

entitled to hold, safe from governmental trespass.' " *McKinney*, 148 Wn.2d at 27 (alteration in original) (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). It is not " 'merely an inquiry into a person's subjective expectation of privacy but is rather an examination of whether the expectation is one which a citizen of this state should be entitled to hold.' " *McKinney*, 148 Wn.2d at 27 (quoting *McCready*, 123 Wn.2d at 270). In determining if an interest constitutes a private affair, we look at the historical treatment of the asserted interest, analogous case law, and statutes and laws supporting the interest asserted. *McKinney*, 148 Wn.2d at 29-32. Voluntary exposure by a defendant is relevant to our inquiry and can negate an asserted privacy interest. *State v. Athan*, 160 Wn.2d 354, 366, 158 P.3d 27 (2007) (citing *McKinney*, 148 Wn.2d at 29).

¶12 We hold that in the context of the facts presented here, Hinton's text messages to Lee's iPhone are not Hinton's private affairs for purposes of article I, section 7.[6] First, there is no long history and tradition of strict legislative protection of a text message sent to, displayed on, and received at its intended destination: another person's iPhone.

¶13 Second, analogous case law from Division One highlights the distinction in article I, section 7 jurisprudence between when a governmental officer intercepts a message transmitted from the sender to the recipient and when a governmental officer views a message received by a third party. *Wojtyna*, 70 Wn. App. at 691-93. In *Wojtyna*, police seized a drug dealer's pager and monitored the pager's incoming calls.[7] 70 Wn. App. at 691. A police detective called one of the incoming telephone numbers and arranged to meet Wojtyna for a drug transaction. *Wojtyna*, 70 Wn. App. at 691. At the meeting site, the police arrested Wojtyna for

---

[6] Hinton does not challenge the seizure of Lee's phone, so we do not address whether he would have standing to object to that seizure.

[7] Whether the seizure of the pager from the drug dealer was lawful was not at issue. *Wojtyna*, 70 Wn. App. at 691.

attempted possession of a controlled substance. *Wojtyna*, 70 Wn. App. at 691.

¶14 Division One rejected Wojtyna's claim that police officers conducted an illegal search under article I, section 7. *Wojtyna*, 70 Wn. App. at 691, 694. While undertaking a *Gunwall* analysis, the court held that while Washington has historically extended strong protection to telephonic and electronic communications, a pager is "fundamentally different" from other forms of protected communications because the activity "is the seizure of a number sent to and *received* by a *third party*[,] which happened to be Wojtyna's." *Wojtyna*, 70 Wn. App. at 692; *see State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). For purposes of article I, section 7, the court explained that the State did not monitor every number Wojtyna dialed at the source, "but rather, where his number was independently displayed and retrieved from the place to which he intended to send it." *Wojtyna*, 70 Wn. App. at 692. For this reason, there was no " 'preexisting state law' " warranting a broader protection than the Fourth Amendment. *Wojtyna*, 70 Wn. App. at 693.

¶15 The court added that it had not found another jurisdiction holding that monitoring a third party's pager was an unconstitutional search under independent state grounds, so the issue was not local in character or of a particular state interest. *Wojtyna*, 70 Wn. App. at 693. The court proceeded to hold that the police did not violate the Fourth Amendment, implicitly holding that the police complied with both article I, section 7 and the Fourth Amendment. *Wojtyna*, 70 Wn. App. at 693-94.

¶16 While the *Wojtyna* court did not use the term "private affair," the only reading of that opinion is that article I, section 7 did not apply because of the nature of the third party relationship did not implicate Wojtyna's privacy interest:

> Wojtyna cannot show that he has sought to preserve the message as "private". By transmitting his number into a pager,

Wojtyna has "run the risk" that it would be received by whomever is in possession or that the owner or someone in possession would disclose the contents. The confidentiality of the transmission was uncertain and there is no reason to find that it was intended to be "private".

*Wojtyna*, 70 Wn. App. at 695-96. This amounted to the private affairs inquiry.

¶17 The reasoning underlying the *Wojtyna* decision applies equally to Hinton's text messages sent to Lee's iPhone. Like in *Wojtyna*, Hinton transmitted messages to a device—Lee's iPhone—over which he had no control. *See Wojtyna*, 70 Wn. App. at 692. By doing so, he voluntarily ran the risk that his messages, once delivered, would be received by whomever possessed the iPhone, and he had no control over what that person might do with that message. *See Wojtyna*, 70 Wn. App. at 692. Like in *Wojtyna*, the State did not monitor every message Hinton sent, "but rather, where his [message] was independently displayed and retrieved from the place to which he intended to send it." *Wojtyna*, 70 Wn. App. at 692; *see also State v. Goucher*, 124 Wn.2d 778, 781, 784, 881 P.2d 210 (1994) (police detective did not violate article I, section 7 when he answered the telephone while executing a search warrant at a suspected drug dealer's home, told the caller that he "was handling business," and arranged a drug transaction with the caller; an individual has no reasonable expectation of privacy when he "voluntarily expose[s] his desire to buy drugs to someone he did not know").

¶18 Third, Hinton cites no statutes, and we know of none, showing that text messages displayed on a third party's phone require protection.[8] Accordingly, the historical treatment of text messages, analogous case law, and the

---

[8] We disagree with the dissent that Washington's privacy act, chapter 9.73 RCW, and its case law demonstrate that the text messages on Lee's iPhone are private affairs under article I, section 7 for two reasons. Dissent at 48-49 (citing *State v. Townsend*, 147 Wn.2d 666, 57 P.3d 255 (2002)). First, our Supreme Court has explained that determining whether the privacy act was violated "is, of course, a very different inquiry than whether the defendant's constitutional rights were

38

lack of analogous statutes show that Hinton's text messages found on Lee's phone are not protected under article I, section 7.[9]

B. The Text Messages Are Not Protected under the Fourth Amendment

¶19 Hinton also argues that the police violated his right to be free from unreasonable search or seizure under the Fourth Amendment. *Wojtyna* again controls the instant case and rejects Hinton's argument.

¶20 When analyzing Wojtyna's Fourth Amendment challenge, the appellate court explicitly adopted the rationale from the Sixth Circuit. *Wojtyna*, 70 Wn. App. at 693-94 (citing *United States v. Meriwether*, 917 F.2d 955 (6th Cir. 1990)). In *Meriwether*, the Drug Enforcement Agency (DEA), pursuant to a search warrant, seized a pager at a suspected narcotics dealer's residence. 917 F.2d at 957. DEA agents monitored and recorded the incoming telephone numbers. *Meriwether*, 917 F.2d at 957. When the defendant's number appeared on the pager, a DEA agent called the defendant and arranged a drug transaction. *Meriwether*, 917 F.2d at 957. The *Meriwether* court rejected the defendant's argument that "he had a reasonable expectation of privacy in the transmitted phone number that was protected under the Fourth Amendment." 917 F.2d at 958. The *Wojtyna* court quoted extensively from the following analysis in *Meriwether*:

> Here, appellant fails to show that he has sought to preserve a message as private by transmitting it into a paging receiver

violated." *State v. Corliss*, 123 Wn.2d 656, 661, 870 P.2d 317 (1994). Second, while *Townsend* held that ICQ (an instant messaging program) messages were private communications for purposes of the privacy act, the Supreme Court ultimately held that the privacy act had not been violated because the defendant impliedly consented to the recording. 147 Wn.2d at 674, 676, 678-79. The court held that the defendant impliedly consented to the recording because the defendant "as a user of e-mail had to understand that computers are, among other things, a message recording device and that his e-mail messages would be recorded on the computer of the person to whom the message was sent." *Townsend*, 147 Wn.2d at 676.

[9] We leave for another day to decide whether a defendant would have standing under article I, section 7 to challenge the seizure of a third party's iPhone.

over which he has no control. Indeed, the Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." We have followed the general theory set forth in *Smith* [*v. Maryland*, 442 U.S. 735, 743-44, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)].[10] In *United States v. Passarella*, 788 F.2d 377 (6th Cir. 1986), an agent, armed with an arrest warrant, entered the defendant's home. While there the agent answered several telephone calls for the defendant. Apparently believing that the agent was the defendant, the callers made incriminating statements about the sale of drugs. We held that the Fourth Amendment does not protect a wrongdoer's misplaced trust that the one intended to receive a communication will actually receive it. We held that the district court properly admitted evidence of the phone conversations.

A party sending a message to a pager has expressed his subjective desire to preserve his privacy even less than in the telephone situation. When one transmits a message to a pager, he runs the risk that the message will be received by whomever is in possession of the pager. Unlike the phone conversation where a caller can hear a voice and decide whether to converse, one who sends a message to a pager has no external indicia that the message actually is received by the intended recipient. Accordingly, when a person sends a message to a pager, he runs the risk that either the owner or someone in possession of the pager will disclose the contents of his message. Since the actual confidentiality of a message to a pager is quite uncertain, we decline to protect appellant's misplaced trust that the message actually would reach the intended recipient.

917 F.2d at 959 (citations omitted) (quoting *Smith*, 442 U.S. at 743-44); *see Wojtyna*, 70 Wn. App. at 693-94. Based on this analysis, the *Wojtyna* court concluded, "Under *Meriwether*, there was no constitutional violation." 70 Wn. App. at 694.

---

[10] In *Smith*, the Court held that an individual does not have a reasonable expectation of privacy in telephone numbers that he or she dials from a home phone. 442 U.S. at 742-44. The Court noted that such an individual "voluntarily convey[s] numerical information to the telephone company and ... [i]n so doing ... assume[s] the risk that the company would reveal to police the numbers he dialed." *Smith*, 442 U.S. at 744.

¶21 Here, like in *Wojtyna*, Hinton sent messages to Lee's iPhone, over which he had no control. *See Wojtyna*, 70 Wn. App. at 694 (quoting *Meriwether*, 917 F.2d at 959). He ran the risk that whoever possessed the iPhone, whether it be Lee or someone else, would receive his messages. *See Wojtyna*, 70 Wn. App. at 694 (quoting *Meriwether*, 917 F.2d at 959). The Fourth Amendment does not protect Hinton's "misplaced trust that the message actually would reach the intended recipient." *Wojtyna*, 70 Wn. App. at 694 (quoting *Meriwether*, 917 F.2d at 959).

¶22 Hinton attempts to distinguish *Wojtyna* on two grounds, neither of which is persuasive. First, he asserts that because cell phones can now "perform[ ] many of the functions of a personal computer," an individual who sends a text message to a cell phone has a greater expectation of privacy in that communication than an individual, like the defendant in *Wojtyna*, who sends a message to a less sophisticated device like a pager. Appellant's Br. at 9. But, as the reasoning in *Meriwether* makes clear, it is the individual's decision to transmit a message to an electronic device that could be in anybody's possession—and not the receiving device's level of technological complexity—that defeats the individual's expectation of privacy in that communication.

¶23 Second, Hinton notes that in *Wojtyna*, the defendant spoke with the DEA agent on the phone "and thereby assumed the risk that the person was not who he claimed he was." Appellant's Br. at 9. Hinton contends that because he exchanged text messages with Sawyer rather than speaking to him on the phone, he had no reason to suspect that another person besides Lee was replying to his text messages. Appellant's Br. at 9-10. Thus, in his view, he enjoyed a greater expectation of privacy than the defendant in *Wojtyna*. Appellant's Br. at 9-10. But *Wojtyna* and *Meriwether* both explicitly addressed the defendants' expectation of privacy in the pager messages themselves. In neither case did it matter to the court's privacy analysis

that a police officer spoke with the defendant by phone before setting up the drug deal. Further, as the *Meriwether* court pointed out, an individual's decision to send a message to an electronic device that could be in anybody's possession actually suggests that the individual "has expressed his subjective desire to preserve his privacy even less than in the telephone situation." 917 F.2d at 959.

¶24 Hinton cites three cases from the federal court of appeals for the proposition that a person has a reasonable expectation of privacy "in e-mails and text messages sent and received from a cell phone." Appellant's Br. at 10-11 (citing *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010); *United States v. Zavala*, 541 F.3d 562, 567, 570 (5th Cir. 2008); *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008)). None of these cases is on point. In *Zavala*, a DEA agent conducted a warrantless search of the defendant's *own cell phone* after stopping the car in which the defendant was travelling on suspicion that the car's occupants had committed an illegal drug transaction. 541 F.3d at 565, 569-71. The court reversed the defendant's conviction because no exception to the warrant requirement applied. *Zavala*, 541 F.3d at 568. The court stated, in relevant part, that the defendant had a reasonable expectation of privacy regarding the information stored on his cell phone. *Zavala*, 541 F.3d at 577. But that is not the issue in the present case—here, the iPhone belonged to Lee, not Hinton. That an individual may have a reasonable expectation of privacy in certain contents of his or her own cell phone, including the sent and received text messages that are stored on the phone, is simply not at issue here.

¶25 In *Forrester*, the Ninth Circuit held that the government's use of a pen register analogue to record the "to" and "from" information in the defendant's e-mails, the Internet protocol addresses of the web sites that the defendant visited, and the total volume of data transmitted to and from the defendant's account did not constitute a Fourth Amendment search. 512 F.3d at 504, 509. In its discussion,

the court noted that the contents of e-mails, just like the contents of letters, "may deserve Fourth Amendment protection," in contrast to the "to" or "from" information in an e-mail message, which is analogous to the address information on the outside of a sealed envelope or the phone number dialed. *Forrester*, 512 F.3d at 510-11. Because the government did not intercept the contents of the defendant's e-mails in *Forrester*, this observation is dicta. In any case, that the Fourth Amendment may prohibit the government from intercepting the contents of an individual's e-mails at an Internet service provider (ISP) has no bearing on this case, where the information was extracted from Hinton's intended receiver's device.

¶26 Lastly, Hinton cites *Warshak*, a Sixth Circuit case that is also inapposite. In *Warshak*, the government instructed the defendant's ISP to preserve the defendant's e-mail messages. 631 F.3d at 283. Thereafter, the ISP preserved copies of 27,000 e-mails that the defendant sent and received—copies that would not have existed without the government's preservation request. *Warshak*, 631 F.3d at 283. The court held that an e-mail subscriber "enjoys a reasonable expectation of privacy in the contents of emails 'that are stored with, or sent or received through, a commercial ISP.' " *Warshak*, 631 F.3d at 288 (quoting *Warshak v. United States*, 490 F.3d 455, 473 (6th Cir. 2007), *vacated*, 532 F.3d 521 (2008)). The court's analysis focused on the unique role that ISPs play in delivering e-mail:

> An ISP is the intermediary that makes email communication possible. Emails must pass through an ISP's servers to reach their intended recipient. Thus, the ISP is the functional equivalent of a post office or a telephone company. As we have discussed above, the police may not storm the post office and intercept a letter, and they are likewise forbidden from using the phone system to make a clandestine recording of a telephone call—unless they get a warrant, that is. It only stands to reason that, if government agents compel an ISP to surrender the contents of a subscriber's emails, those agents have thereby conducted a Fourth Amendment search, which necessitates

compliance with the warrant requirement absent some exception.

631 F.3d at 286 (citation omitted). As this analysis makes clear, the *Warshak* court was primarily concerned with the legality of the government's request that a service provider *intercept* a customer's e-mails before the e-mails reached the intended recipient's computer. Here, there was no interception, through the service provider or otherwise. Sawyer simply read the text messages after they were delivered to the intended recipient.

¶27 While *Warshak* does not aid Hinton, its comparison of e-mails with traditional forms of communication is helpful and we adopt it to hold that text messages deserve privacy protection similar to that provided for letters. It is well established that letters are "in the general class of effects" protected by the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 114, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *see also United States v. King*, 55 F.3d 1193, 1195-96 (6th Cir. 1995). However, if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery. *King*, 55 F.3d at 1196 (holding that where King voluntarily mailed the letters at issue to his wife and did not expect her to return them, "his expectation of privacy in the letters terminated upon delivery of the letters to his wife"); *United States v. Knoll*, 16 F.3d 1313, 1322 (2d Cir. 1994) ("[B]ecause Gleave sent the letters to an individual with whom he had no relationship of confidentiality, any legitimate expectation of privacy he may have had in them was abandoned."); 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.3(f) (2d ed. 1987). This is true even though the sender may have instructed the recipient to keep the letters private. *King*, 55 F.3d at 1196.

¶28 This rule has been applied to e-mail. *See United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (holding that, like letter writers, whose expectation of privacy ends upon delivery of the letter, individuals do not possess a legitimate expectation of privacy "in transmissions over the

44

Internet or e-mail that have already arrived at the recipient"); *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) (a sender of an e-mail "would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient"); *United States v. Dupree*, 781 F. Supp. 2d 115, 159 (E.D.N.Y. 2011) (holding that defendants could not claim a legitimate expectation of privacy in e-mails that they gave an employee permission to access and view). As Professor Wayne R. LaFave explains in the Fourth Amendment e-mail context:

> [J]ust as a letter writer's "expectation of privacy ordinary terminates upon delivery" of the letter . . . once e-mail "transmissions are received by another person, the transmitter no longer controls its destiny." This means, for example, that the person sending the e-mail has no valid Fourth Amendment complaint should the recipient turn the message over to the police or forward it on to others, or should the recipient turn out to be an undercover police officer.

1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.6(f) at 727 (4th ed. 2004) (footnotes omitted) (quoting *King*, 55 F.3d at 1196; *United States v. Maxwell*, 45 M.J. 406, 418 (C.A.A.F. 1996)). Here, a text message user would expect that any privacy of the text message would terminate upon delivery to the receiving party and be subject to government trespass.

¶29 We decline to offer communication made using a technological device more privacy protections than have been provided for letters, one of the most traditional forms of communication. Case law has consistently applied the standard for letters to new technology. Like letters, a defendant has a privacy interest in messages stored on his or her own cell phone. *See Zavala*, 541 F.3d at 575-76. Like letters, electronic communications, including text messages, may not be intercepted and searched. *See Warshak*, 631 F.3d at 286. To now hold that a text message, received and automatically stored by a private recipient, is entitled to constitutional protection would be to depart from the logical application of traditional privacy rules.

¶30 On his own iPhone, on his own computer, or in the process of electronic transit, Hinton's ·communications are shielded by our constitutions. But after their arrival, Hinton's text messages on Lee's iPhone were no longer private or deserving of constitutional protection.[11] Accordingly, the trial court did not err by denying Hinton's motion to suppress.

¶31 Affirmed.

WORSWICK, C.J., concurs.

¶32 VAN DEREN, J. (dissenting) — I respectfully dissent. I would hold that Detective Kevin Sawyer did more than "simply read the text messages [from Shawn Hinton] after they were delivered to the intended recipient." Majority at 43. Sawyer engaged in a continuing search when he first searched the contacts list on Daniel Lee's iPhone[12] to find Hinton's phone number and then used Lee's iPhone to send and receive messages from Hinton. Under these circumstances, I would hold that Sawyer was required to obtain a search warrant and his failure to do so before conducting this search constituted a violation of article I, section 7 of our state constitution. Thus, evidence gathered as a result of the unlawful intrusion should be suppressed.

¶33 Courts are charged with enforcing legally protected expectations of privacy, even as technology advances. The majority's opinion exposes every user of a "smartphone" to unregulated State searches of their phone's contents, without probable cause and without a search warrant, if a police officer comes into possession of such a phone. This reasoning could be used to erode the necessity of a search warrant for home computers if police come into possession of such a personal computer. That has not been the law in Washing-

---

[11] Again, we leave for another day the question whether a defendant has standing to suppress the seizure of a third party's phone.

[12] *See* majority at 31 n.1.

ton. *See State v. Grenning*, 142 Wn. App. 518, 532, 174 P.3d 706 (2008) (warrant must specifically authorize search of computer), *aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010); *State v. Nordlund*, 113 Wn. App. 171, 182, 53 P.3d 520 (2002).

¶34 Thus, the trial court should have suppressed the evidence seized as a result of the warrantless search unless one of the narrow exceptions to the warrant requirement applied, none of which are argued here. I would reverse Hinton's conviction and would vacate the order denying suppression of the evidence seized from Lee's iPhone.

## I. ARTICLE I, SECTION 7 AND FOURTH AMENDMENT PROTECTIONS FROM STATE INTRUSION INTO PRIVATE AFFAIRS

¶35 " 'When a party claims both state and federal constitution violations, we turn first to our state constitution.' " *State v. Afana*, 169 Wn.2d 169, 176, 233 P.3d 879 (2010) (quoting *State v. Patton*, 167 Wn.2d 379, 385, 219 P.3d 651 (2009)). As our Supreme Court has stated:

> Although they protect similar interests, "the protections guaranteed by article I, section 7 of the state constitution are qualitatively different from those provided by the Fourth Amendment to the United States Constitution." *State v. McKinney*, 148 Wn.2d 20, 26, 60 P.3d 46 (2002). The Fourth Amendment protects only against "unreasonable searches" by the State, leaving individuals subject to any manner of warrantless, but reasonable, searches.
>
> By contrast article I, section 7 is unconcerned with the reasonableness of the search, but instead requires a warrant before any search, reasonable or not. This is because "[u]nlike in the Fourth Amendment, the word 'reasonable' does not appear in any form in the text of article I, section 7 of the Washington Constitution." *State v. Morse*, 156 Wn.2d 1, 9, 123 P.3d 832 (2005). Understanding this significant difference between the Fourth Amendment and article I, section 7 is vital to properly analyze the legality of any search in Washington.

*State v. Eisfeldt*, 163 Wn.2d 628, 634-35, 185 P.3d 580 (2008) (alteration in original) (citations omitted).

¶36 Additionally, the United States Supreme Court encourages deference to state and lower federal courts to develop the law on privacy interests in text messages. *City of Ontario v. Quon,* 560 U.S. 746, 130 S. Ct. 2619, 2629, 177 L. Ed. 2d 216 (2010). In specifically declining to address whether, under the Fourth Amendment, an individual has a privacy interest in text messages sent to and from an employer-owned pager, the Court cautioned against "risk-[ing] error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." *Quon,* 130 S. Ct. at 2629. Similarly, in *United States v. Jones,* ___ U.S. ___, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012), the majority opinion was careful not to make an expansive rule on privacy expectations in light of current technology. Presumably, the Court was leaving such decisions to be made at the state level.

¶37 Accordingly, article I, section 7, which provides greater protection to individuals than the Fourth Amendment, is the proper analytic framework for this issue.

Article I, Section 7 Protects Individuals from Police Searches Absent a Warrant or an Exception to the Warrant Requirement

¶38 Article I, section 7 of our state constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." In determining whether a search violated article I, section 7, we engage in a two-step analysis. The first step requires us to determine whether the State has intruded into a person's private affairs. *State v. Valdez,* 167 Wn.2d 761, 772, 224 P.3d 751 (2009). "The term 'private affair[ ]' generally means 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass.' " *State v. Athan,* 160 Wn.2d 354, 366, 158 P.3d 27 (2007) (quoting *State v. Myrick,* 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). "In determining if an interest constitutes a 'private affair,' we look at the historical treatment of the

interest being asserted, analogous case law, and statutes and laws supporting the interest asserted." *Athan*, 160 Wn.2d at 366.

¶39 If we determine that the interest asserted constitutes a "private affair," the second step asks whether the authority of law required by article I, section 7 justifies the intrusion. *Valdez*, 167 Wn.2d at 772. This requirement is satisfied by a valid warrant, limited to a "few 'jealously and carefully drawn exceptions.' " *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996) (internal quotation marks omitted) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)).

¶40 Although the privacy interest asserted here, text messages sent to another individual's smartphone, appears to be an issue of first impression in this state, Washington's privacy act (Act), chapter 9.73 RCW, and cases interpreting it show that text messages are undoubtedly "private affairs" entitled to article I, section 7 protections. *See Athan*, 160 Wn.2d at 366, 370-71 (analyzing what constitutes a "private affair" for purposes of article I, section 7 by examining provisions of the Act).

¶41 In *State v. Townsend*, 147 Wn.2d 666, 669, 57 P.3d 255 (2002), our Supreme Court addressed whether a provision in the Act required the trial court to suppress the defendant's e-mail and real time Internet client-to-client messages with an undercover police officer posing as a fictitious minor. It clearly determined that Townsend's communications were private. *Townsend*, 147 Wn.2d at 674. The *Townsend* court stated:

> We hold, as did the Court of Appeals, that Townsend's communications to the fictitious child, Amber, were private. We reach that conclusion because it is readily apparent from the undisputed facts that Townsend's subjective intention was that his messages to Amber were for her eyes only. That intent is made manifest by Townsend's message to Amber to not "tell anyone about us." [*Townsend* Clerk's Papers] at 66. In addition, the subject matter of Townsend's communications to Amber

strongly suggests that he intended the communications to be private. While interception of these messages was a possibility, we cannot say that Townsend's subjective intention that his communications were private was unreasonable under the circumstances.

147 Wn.2d at 674.

¶42 Here, as in *Townsend*, it is clear that Hinton intended his communications to Lee to be private. And, as the *Townsend* court noted, "The mere possibility that interception of the communication is technologically feasible does not render public a communication that is otherwise private." 147 Wn.2d at 674. Likewise, the possibility that another person could potentially access Lee's iPhone and read text messages sent to Lee from Hinton does not render Hinton's private communications public.

¶43 This case is distinguishable from *State v. Goucher*, 124 Wn.2d 778, 881 P.2d 210 (1994). In *Goucher*, our Supreme Court held that a police detective did not violate article I, section 7 when he answered the telephone at a suspected drug dealer's residence while executing a search warrant and then discussed a drug transaction with the caller. 124 Wn.2d at 780-81, 789. In holding that the detective did not violate article I, section 7, the court reasoned that the defendant "voluntarily exposed his desire to buy drugs *to someone he did not know*," and that the defendant "neglect[ed] to observe that his conversation was with *an acknowledged stranger*." *Goucher*, 124 Wn.2d at 784 (emphasis added).

¶44 Hinton did not voluntarily expose his desire to purchase drugs from an acknowledged stranger but, rather, communicated with an officer pretending to be Lee after the officer searched and used Lee's iPhone. Although by sending a text message to Lee's iPhone, Hinton risked Lee exposing his communications to others and risked his communications becoming known to law enforcement through a valid search of Lee's iPhone pursuant to search warrant, it does not diminish his expectation that his text

messages would not be subject to a warrantless search by government agents. *See Eisfeldt*, 163 Wn.2d at 637 ("[A]rticle I, section 7 protects 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from *governmental trespass absent a warrant.*'" (emphasis added) (quoting *Myrick*, 102 Wn.2d at 511)).

¶45 While it is technically possible for every text message sent from one smartphone to another smartphone to be tracked and viewed by people other than the recipient, this technological ability does not negate a text message user's privacy interests, particularly from the government's unwarranted, prying eye. *See Townsend*, 147 Wn.2d at 674. "'Privacy is not a discrete commodity, possessed absolutely or not at all.'" *Jones*, 132 S. Ct. at 947 (Sotomayor, J., concurring) (quoting *Smith v. Maryland*, 442 U.S. 735, 749, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) (Marshall, J., dissenting)). As Justice Marshall so eloquently stated in 1979:

> But even assuming, as I do not, that individuals "typically know" that a phone company monitors calls for internal reasons, it does not follow that they expect this information to be made available to the public in general or the government in particular. Privacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a bank or phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes.
>
> . . . .
>
> Implicit in the concept of assumption of risk is some notion of choice. . . . [U]nless a person is prepared to forgo use of what for many has become a personal or professional necessity, he cannot help but accept the risk of surveillance. It is idle to speak of "assuming" risks in contexts where, as a practical matter, individuals have no realistic alternative.

*Smith*, 442 U.S. at 749-50 (Marshall, J., dissenting) (footnote and citations omitted).

¶46 Although not directly addressing whether individuals retain a reasonable expectation of privacy in text

messages sent to third parties, two recent United States Supreme Court cases suggest that the public has a reasonable expectation of privacy in cell phone and text message communications.

¶47 In *Quon*, the United States Supreme Court addressed an employee's use of an employer-provided pager. 130 S. Ct. 2619. Although recognizing that the case touched "issues of farreaching significance" and discussed "employees' privacy expectations vis-à-vis employer-provided technological equipment," the Court declined to address whether Quon had a reasonable expectation of privacy in his text messages. *Quon*, 130 S. Ct. at 2624, 2630. Instead, the *Quon* Court held that even assuming Quon had a reasonable expectation of privacy, the search of text messages contained on his employer-owned pager for work-related purposes was reasonable. 130 S. Ct. at 2630-31. However, the *Quon* Court strongly suggested that outside the employee-employer context, the public would have a reasonable expectation of privacy in text message communications, noting:

> Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification. That might strengthen the case for an expectation of privacy [in the employee-employer context]. On the other hand, the ubiquity of those devices has made them generally affordable, so one could counter that employees who need cell phones or similar devices for personal matters can purchase and pay for their own.

130 S. Ct. at 2630.

¶48 The *Quon* Court also equated the search of a personal e-mail account or pager with a wiretap of a person's phone line. 130 S. Ct. at 2631. Thus, the Supreme Court in *Quon* strongly suggested that an individual has a reason-

able expectation of privacy in text messages under the Fourth Amendment.[13]

---

[13] Other courts have found that individuals have a reasonable expectation of privacy in their cell phones and the information contained on their cell phones, including text messages. *See, e.g., United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) ("[C]ell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers"; thus, defendant had a "reasonable expectation of privacy regarding [the cell phone's contents]."); *United States v. Finley*, 477 F.3d 250, 259 (5th Cir. 2007) (A defendant had a reasonable expectation of privacy in the text messages stored on his cell phone because he had possessory interest in the phone and took "normal precautions to maintain his privacy in the phone."); *United States v. Davis*, 787 F. Supp. 2d 1165, 1170 (D. Or. 2011) ("A person has a reasonable expectation of privacy in his or her personal cell phone, including call records and text messages."); *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009) ("A search warrant is required to search the contents of a cell phone unless an exception to the warrant requirement exists."); *State v. Smith*, 124 Ohio St. 3d 163, 169, 2009-Ohio-6426, 920 N.E.2d 949 (Cell phone users have "a reasonable and justifiable expectation of a higher level of privacy in the information [cell phones] contain" because of their multifunctional uses and ability to store large amounts of private data, including text messages.). *But cf. United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012) (police officers may conduct a warrantless search of arrestee's cell phone to obtain the cell phone number).

Admittedly, these cases do not address an individual's expectation of privacy in text messages that are communicated to a third party. However, the Sixth Circuit Court of Appeals has held that "the mere *ability* of a third-party intermediary to access the contents of a communication cannot be sufficient to extinguish a reasonable expectation of privacy." *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010). The *Warshak* court held:

> [A] subscriber enjoys a reasonable expectation of privacy in the contents of emails "that are stored with, or sent or received through, a commercial [Internet service provider (ISP)]." The government may not compel a commercial ISP to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause. Therefore, because they did not obtain a warrant, the government agents violated the Fourth Amendment when they obtained the contents of Warshak's emails. Moreover, to the extent that the [Stored Communications Act (SCA), 18 U.S.C. section 2703,] purports to permit the government to obtain such emails warrantlessly, the SCA is unconstitutional.

631 F.3d at 288 (citations omitted) (quoting *Warshak v. United States*, 490 F.3d 455, 473 (6th Cir. 2007)).

I would hold that the *Warshak* court's rationale in establishing individuals' reasonable expectation of privacy in the contents of their e-mail is equally applicable to cell phone users' expectation of privacy in the contents of their text messages. I would also extend the *Warshak* court's holding to prohibit a warrantless search by government agents of text messages sent to and stored on a third party's cell phone. In my view, a third party's ability to access text messages sent by an individual does not diminish the text message sender's expectation of privacy in his or her text message communications.

¶49 In *Jones*, the United States Supreme Court held that the installation of a global-positioning-system (GPS) tracking device on a vehicle registered to the respondent's wife constituted a search. 132 S. Ct. at 946. The case gave the Court the opportunity to examine Fourth Amendment jurisprudence in the age of new technologies, but the Court issued a narrow rule relating to the GPS multiday search.

¶50 The majority opinion by Justice Scalia, as well as Justice Sotomayor's and Justice Alito's concurring opinions, denied the contention by the government that no search had occurred since Jones had "no reasonable expectation of privacy" in his vehicle's locations on the public roads, which were visible to all. *Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring). The Court's ruling that this was a search was partially based on the fact that the officers " 'did *more* than conduct a visual inspection of respondent's vehicle.' By attaching the device to the Jeep, officers encroached on a protected area." *Jones*, 132 S. Ct. at 952 (quoting Br. of U.S., 2011 WL 3561881, at *41). The Court has previously recognized that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." *Bond v. United States*, 529 U.S. 334, 337, 120 S. Ct. 1462, 146 L. Ed. 2d 365, (2000).

¶51 Similarly here, Sawyer did more than conduct a visual inspection of Lee's iPhone. As anyone who has seen or used an iPhone knows, looking at text messages and engaging in text message conversations requires more than a visual look at the iPhone. The information obtained by Sawyer was obtained through an invasive inspection of the text messages in the iPhone's software and through Sawyer posing as Lee using Lee's iPhone to contact the message sender. We should not assume that Hinton had no expectation of privacy and that he reasonably expected that a government actor would search Lee's iPhone without a warrant and initiate a conversation that would set him up for arrest.

¶52 Justice Sotomayor, in concurrence in *Jones*, emphasized the privacy concerns with new technologies such as cell phones:

More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. *E.g.*, *Smith*, 442 U.S., at 742; *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the [uniform resource locator]s that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as Justice ALITO notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

*Jones*, 132 S. Ct. at 957 (citations omitted) (quoting *Jones*, 132 S. Ct. at 962 (Alito, J., concurring)).

¶53 Voluntarily disclosed information is also entitled to state constitutional protection. Under article I, section 7, an exception to the search warrant must apply before the evidence obtained from Lee's iPhone can be used against Hinton. But, the State posits no exception to the search warrant requirement. It argues only that Hinton has no "legitimate expectation of privacy" in the text messages. Clerk's Papers at 19-20. I would hold that he did and that

the search occurred without authority of law, i.e, a court-issued search warrant.

¶54 It is also worth noting that many, if not most, mobile phone owners are in immediate possession of their phones at all times.[14] The fact that this kind of phone, as opposed to a landline telephone, is so closely associated with an individual lends credence to the conclusion that a sender of a text message has a privacy interest that the phone's owner will be the immediate recipient of the message and, thus, the sender can expect that the message will remain private absent voluntary action by the phone's owner to disclose the contents of the text message. And, in many respects, the user of text messages has a greater privacy interest in text messages than in oral conversations because oral conversations can be overheard.[15] In contrast, text messages are insulated from the accidental or deliberate eavesdropper unless the eavesdropper possesses the receiving phone. Thus, the privacy interests of the text users should not be swept away by arguments that their messages are not private.

## II. TEXT MESSAGE PRIVACY INTEREST PROTECTIONS

¶55 In holding that Hinton did not have an expectation of privacy in his text messages to Lee, the majority fails to take into account evolving notions of privacy in a society increasingly reliant on electronic forms of communication. For example, in *Quon*, amici curiae in support of respondent Quon presented statistical data on the prevalence of elec-

---

[14] Cell phones are commonly provided by employers so that employees are expected to be checking them throughout the day. Many employers also permit cell phones to be within reach all day so that work lines will not be tied up with personal calls. Br. of Electronic Frontier Foundation et al. as Amici Curiae in Supp. of Resp'ts, *City of Ontario, Cal. v. Quon*, No. 08-1332, 2010 WL 1063463, at *16 (U.S. Mar. 23, 2010); *see generally* Katharine M. O'Connor, Note, *:o OMG They Searched My Txts: Unraveling the Search and Seizure of Text Messages*, 2010 U. ILL. L. REV. 685.

[15] "The [text message] user seeks to exclude the communication from the uninvited ear by avoiding speaking into the mouthpiece altogether." O'Connor, at 713.

tronic forms of communication to support the argument that society recognizes an expectation of privacy in text messages:

> A 2009 survey found that 85% of adults owned a mobile phone. Approximately nine out of ten adults use a mobile phone and one in seven adults owns *only* a mobile phone. Furthermore, 14.5% of American homes received "all or almost all" calls on wireless telephones, even if there also was a landline telephone in the house. Stephen J. Blumberg & Julian Luke, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey*, CDC National Center for Health Statistics, July-December 2008, http://tiny.cc/cdcnihstats. . . .
>
> . . . .
>
> Texting, along with the related services for transmitting photos and videos between phones, has become an extremely popular form of communication, with an average of 4.1 billion text messages sent and received in the nation *each day.*
>
> Many Americans today use text messages to convey information that formerly would have been the subject of an oral telephone conversation. According to a 2008 Nielson Mobile survey, U.S. mobile subscribers "sent and received on average 357 text messages per month [in the second quarter of 2008], compared with making and receiving 204 phone calls a month. . . . " Marguerite Reardon, *Americans Text More Than They Talk*, CNET, Sept. 22, 2008, http://tiny.cc/CNET.

Br. of Electronic Frontier Foundation et al. as Amici Curiae in Support of Resp'ts, *City of Ontario v. Quon*, No. 08-1332, 2010 WL 1063463, at *6-8 (U.S. Mar. 23, 2010) (Br. of EFF) (footnotes and citation omitted).

¶56 Statistical data on the prevalence of electronic communications clearly demonstrate that sending and receiving of text messages on a cell phone, "texting,"[16] has become

---

[16] Text messaging, also known as short message service (SMS) or "texting," uses cell phones or pagers to send and receive electronic written messages.

the predominant form of communication.[17] And American teenagers, in particular, engage in substantially more text messages per day than phone calls and certainly more than letters.[18] This emerging data establishes, and courts cannot ignore, a clear shift in Americans' private communications from older forms of postal mail, telephone, and face-to-face conversations to text and e-mail messages generated and stored on smartphones.[19]

¶57 Courts must analyze new forms of communication within the context of our society's evolving and existing expectations of privacy.[20] Justice Sotomayor recognized this in *Jones*. And the United States Supreme Court acknowledged in *Quon* that "[r]apid changes in the dynamics of communication and information transmission are evident not just in the technology itself but in what society accepts as proper behavior." 130 S. Ct. at 2629; *see also United States v. Warshak*, 631 F.3d 266, 285 (6th Cir. 2010) ("[T]he Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish." (citing *Kyllo v. United States*, 533 U.S. 27, 34, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001))). Seemingly, if the Supreme Court is willing to recognize these concerns under the Fourth Amendment, we surely need to recognize them under the even greater protections provided by article I, section 7 of the Washington State Constitution.

---

[17] Text-message use is expected to continue to surge. "One study estimated that there were 5 trillion SMS texts sent worldwide in 2009 and that there will be more than 10 trillion SMS texts sent worldwide in 2013." Br. of EFF, 2010 WL 1063463, at *9.

[18] One study found that American teenagers sent an average of 3,146 texts per month. Br. of EFF, 2010 WL 1063463, at *9.

[19] Br. of EFF, 2010 WL 1063463, at *10; *see also* O'Connor, at 685.

[20] Well established case law under the Fourth Amendment provides that a sender of a letter or other sealed package has a reasonable, and legitimate, expectation of privacy in those articles *until* they are delivered to the recipient. *See, e.g., United States v. Jacobsen*, 466 U.S. 109, 114, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). This doctrine is unworkable in the electronic communication context because electronic messages are delivered nearly instantaneously and, thus, would leave the sender of electronic communications with no expectation of privacy.

¶58 The majority's opinion abrogates the protections of article I, section 7 in Washington and rejects the Fourth Amendment protections of all citizens. Never would our constitutional framers have anticipated that the razzle-dazzle of technology would expose citizens to unconsented, unexamined State intrusion into their private affairs. Recognizing the prevalence of individual electronic communication on handheld computers, i.e., smartphones, and society's evolving notions of privacy in those communications, I would hold that the officer's warrantless search of Lee's iPhone to obtain Hinton's phone number and text messages violated article I, section 7 of our state constitution absent a narrow exception to the warrant requirement.

¶59 Broadly interpreted, the majority's holding provides that no citizen of this state has an expectation of privacy in any form of electronic communication under either our state or federal constitutions.[21] That holding undermines every individual's protection from State intrusion into their legitimate privacy interests in communications afforded by evolving and existing technology.[22]

¶60 Accordingly, I dissent.

Review granted at 175 Wn.2d 1022 (2012).

---

[21] Because I would hold the warrantless search unconstitutional on state constitutional grounds, I do not further address Hinton's Fourth Amendment challenge. *State v. Monaghan*, 165 Wn. App. 782, 795, 266 P.3d 222 (2012).

[22] Should this be the law in Washington, every cell phone purchaser, including youth, who tend to use these phones without discretion, should necessarily be warned that the State may search their or their friends' cell phones without a legally issued search warrant based on probable cause. This result cannot help but offend constitutional notions of individual protections from unwarranted State intrusion into private affairs.